WINN, Respondent, vs. ITZEL and others, Appellants. and
TAYLOR and another, Respondents.

*March 15—May 2, 1905.*

*Equity: Fraud: Undue influence: Action to set aside deed: Evidence:
Falsifying official certificate: Appeal and error: Affirmance and
reversal: Findings when disturbed: Trial: Testimony taken
after argument begun: Discretion: Witnesses: Examination and
cross-examination: Production of documents: Privilege of at-
torneys: Confidential communications: Trial: Shifting of burden
of proof.*

1. In an action to set aside a deed for fraud and undue influence, tes-
   timony of the notary who took and certified the acknowledgment
   that the grantor did not speak, nor express by look or act any
   consciousness whatever of the transaction at the time the deed
   was executed; that she could not sign her name, that he wrote
   it, and a third person lifted her hand and put it on the pen while
   the notary made the mark,—is admissible.
2. Such testimony is, however, of little weight, in the absence of a
   satisfactory explanation by the notary showing that the official
   certificate (that the deed was signed, sealed, and delivered as
   the free and voluntary act of the grantor for the uses and pur-
   poses therein set forth), though mistaken, was honestly made at
   the time.
3. A judgment in an equitable action will not be reversed merely for
   the erroneous admission of evidence. On appeal the evidence
   wrongly admitted will be ignored.
4. In the absence of abuse of discretion it is not error to allow the
   introduction of further evidence after the testimony is formally
   closed and the argument begun.
5. In an action by a trustee for instructions as to the execution of
   a trust, a cross-complaint was filed to set aside a deed for fraud
   and undue influence. Neither in his complaint nor in his open-
   ing testimony did plaintiff show any personal interest in the
   controversy, and the actual litigation was between the defend-
   ants. Plaintiff, in his direct testimony, did not give any evi-
   dence bearing upon the merits of the contest, but contented him-
   self with merely bringing before the court the situation of the
   trust and the trust property and the claims of the contending
   parties. *Held* that, while the witness was a party to the action,
   he was only nominally such, and it is doubted whether, in the

application of the rules of cross-examination, he should be considered as in any different class from ordinary witnesses, and subject, against objection, to extensive cross-examination upon subjects not even mentioned in his direct examination.

6. Plaintiff, an attorney, on being asked to produce certain letters which he then had in his possession in the court room, declined to do so, claiming privilege as an attorney, in which he was sustained. Immediately thereafter it appeared that the witness had but one letter with him, which was produced and read in evidence. Afterwards he stated he had others at his office, but objected to their production on the ground that they were addressed to him as an attorney. Here the matter dropped, without ruling or exception. *Held*, no prejudicial error was committed, since counsel for defendant should have given formal notice to produce the letters, or at least should have demanded production, basing such demand on a statement of what he expected to prove, and then obtained a ruling and preserved an exception.

7. In an action by a trustee for instructions as to the execution of his trust, it appeared, among other things, that plaintiff was the trustee in a deed of trust executed by a person since deceased, which required the trustee to convey to such persons as decedent should direct; that the decedent, after certain legacies of money and personal property, devised the residue of her estate to named beneficiaries, and that before her death decedent conveyed certain of the trust estate to I., which conveyance was contested by the residuary legatees as having been obtained by fraud and undue influence. It appeared on the trial that I. had withdrawn her objections to the appointment of plaintiff as executor, and had agreed to assist him in the settlement of the estate, on plaintiff's agreement to deliver to a trustee certain personal property bequeathed to I. *Held*, that it was not error to sustain an objection to a question, asked plaintiff by I.'s counsel, whether he had the receipt given by I. on the payment of her legacy to her.

8. Where plaintiff, an attorney, had testified to an interview with a decedent the day before a deed, sought to be set aside on the ground of fraud and undue influence, was executed, and denied that anything was said in that interview about a description of the property in litigation, or that he would cause such description to be sent, objections were improperly sustained to questions put to a witness, also an attorney, officing with plaintiff, tending to show that plaintiff had asked witness to send a description of the property to decedent.

9. On an issue as to whether a deed from a decedent was obtained

by fraud and undue influence, there was no direct testimony of fraud or undue influence, or of words of abuse or blandishment, but the circumstances under which the deed was actually signed were relied upon as being sufficient to justify a finding of actual fraud, under the rule that, when a person charging fraud and undue influence had proved certain facts, he had made a *prima facie* case, though he might not have produced any direct evidence of fraudulent acts or words, and might then rest his case, and the defendant must then rebut the inference of fraud so raised by affirmative proof of good faith. *Held*, that it was error to rule that thereupon.the burden of proof shifted to defendant to show the fairness of the transaction, notwithstanding plaintiff had affirmative evidence still in reserve.

10. In such case it was nevertheless incumbent on plaintiff to make his case in the first instance, and to present all the proof which he had and wished to present tending to prove fraud, whether circumstantial or direct.

11. In such case it was the duty of the court, at the close of plaintiff's case, to decide whether a *prima facie* showing of fraud had been made, if raised by proper motion.

12. In such case, if the trial court held that a *prima facie* case of fraud had been made, the defendant could either stand upon plaintiff's proofs and challenge their sufficiency on appeal, or he could introduce his own proofs tending to rebut plaintiff's case and establish his innocence.

13. In actions to set aside instruments on the ground of fraud and undue influence it is practically impossible to lay down any exact rule or rules for determining what circumstances, when proved, will raise an inference of fraud.

14. In such cases, in a general way, there must be shown a subject unquestionably susceptible to undue influence, either as the result of old age, mental weakness, or both; also some clear evidence of opportunity and a disposition on the part of the beneficiary to exercise such influence.

15. In such case "opportunity" does not mean mere physical propinquity or possibility of personal contact, but the fact that interviews or personal transactions between the parties were had, followed by the accomplishment of the desired end.

16. In an action where the issues were on the question of whether a deed from a decedent was obtained by fraud and undue influence, under the evidence, stated in the opinion, it is *held* that, considering a *prima facie* case of fraud was established, it was fully and fairly met by the testimony of the grantee, and it was error to award judgment setting aside the deed.

APPEALS from a judgment of the circuit court for Milwaukee county: LAWRENCE W. HALSEY, Circuit Judge. *Reversed.*

This is an action in equity brought by a trustee of certain real property to obtain from the court direction as to his duty with regard to the transfer of the title of said property. The plaintiff, *Winn*, in June, 1897, was made trustee under a deed of trust executed by Matilda O. Abbey of certain real estate in Milwaukee, and, among other duties, he was required to convey said property to such person or persons as Mrs. Abbey, by instrument in writing or by last will, should appoint. Mrs. Abbey died September 4, 1898, having made the respondents *Taylor* and *Mathews* residuary devisees under her last will. The defendant *Itzel* claimed the title to a certain piece of said real property, known as the Eighth street property, and being a part of the land covered by the trust deed, by virtue of a deed to her claimed to have been executed by Mrs. Abbey two days before her death. The defendants *Mathews* and *Taylor* answered by way of cross-complaint, and claimed that the deed to the defendant *Itzel* was obtained by fraud and undue influence. The defendant *Itzel* answered, claiming her right under said deed and denying alleged fraud. The defendants *O'Keeffe* and *Harkins* were interpleaded as judgment creditors of the defendant *Itzel,* and they claimed their judgments to be valid liens. The action was tried by the court, and the facts that were undisputed may be stated as follows: Mrs. Matilda O. Abbey, the testatrix, was for many years a resident of Milwaukee, Wisconsin. Her first husband was named Burchard, by whom she had a son, Harvey Burchard, and from whom she received a considerable amount of property. After the death of Burchard she married one Abbey and survived him a considerable number of years. Her son, Harvey, died in 1892, and Mrs. Abbey herself died September 4, 1898, leaving as her nearest relatives the defendant *Annie Mathews,* a half-sister, and the defendant *Taylor,* a nephew,

both of whom lived in the east. At the time of her death Mrs. Abbey was aged and feeble. The trial court found that she was eighty-two years of age, but the testimony is not very definite on this point. Prior to the death of her son, Harvey, one Carl Braunschweiger had been his valet, and after the death of the son Braunschweiger was retained in the employ of Mrs. Abbey as a steward and so remained to Mrs. Abbey's death, looking after the household affairs, employing servants, and paying bills. The defendant *Anna Itzel* was a music teacher in Milwaukee, and in the summer of 1896 went to live with Mrs. Abbey as a companion, and lived with her until Mrs. Abbey's death. These three people constituted the household, and they remained living in Milwaukee until early in the year 1897, when they moved to Waukegan, Illinois, at first boarding and afterwards keeping house for about a year before Mrs. Abbey's death. Mrs. Abbey's property interests in Milwaukee amounted to about $140,000, including the lot in question in this litigation, which was appraised at $9,000. From 1890 to 1896 Mr. A. B. Geilfuss conducted her business affairs, at which latter date the plaintiff took charge of the same. In June, 1897, Mrs. Abbey made a trust deed conveying all her real and personal estate to the plaintiff, to look after and care for the same, and provide therefrom for Mrs. Abbey during her lifetime, and upon her death to convey and assign the said property and all the proceeds thereof to such person or persons as Mrs. Abbey, by instrument in writing or by last will, should appoint. In September, 1896, Mrs. Abbey executed her will, in which, among other legacies, she gave $2,000 to Braunschweiger, $1,000 to *Anna Itzel,* and one fourth of the residue of the estate to the defendant *Annie Mathews,* and the rest to the defendant *Taylor.* In June, 1897, she executed a codicil to the will, in which she increased the legacy to Braunschweiger to $3,000, added $1,000 to the legacy of the defendant *Anna Itzel,* and also gave her a considerable amount of jewelry and household furniture, made a legacy of $3,000

to the plaintiff, *John E. Winn,* and disposed of the rest of her estate practically as before. In the spring of 1898 the plaintiff, *Winn,* went to Europe and did not return until about September 1st of that year, and upon his return received word that Mrs. Abbey. was quite sick in Waukegan. He went to Waukegan on the 1st day of September and found Mrs. Abbey quite ill. He submitted to her his accounts as trustee and returned to Milwaukee. On the following day Mrs. Abbey executed a deed of the property in controversy to the defendant *Anna H. Itzel.* This deed was signed by her mark and was witnessed by C. T. Heydecker, an attorney at law at Waukegan, Clara D. Pettifoe, a trained nurse and attendant on Mrs. Abbey, and Carl Braunschweiger. The court found, in effect, that Mrs. Abbey was incompetent to execute a deed at the time when the same was signed and that the same was never in fact executed and delivered by her, and that it was the result of fraud and undue influence on the part of the defendant *Itzel* and said Braunschweiger, acting in confederation, and thereupon declared the same to be void and of no effect, and adjudged that the defendants *Mathews* and *Taylor* were entitled to a conveyance of said property from the trustee in the proportions given them by the will, and further adjudged that the defendants *Mathews* and *Taylor* recover costs from the defendants *Itzel, Harkins,* and *O'Keeffe.* The appellant *Anna H. Itzel* appealed from the entire judgment. The defendants *Harkins* and *O'Keeffe* appealed from that part of the judgment holding them liable for costs.

For the appellants there was a brief by *McElroy & Eschweiler,* attorneys, and *J. E. Roehr,* of counsel, for *Itzel,* and *E. J. Ludwig,* attorney, and *McElroy & Eschweiler,* of counsel, for *O'Keeffe;* a separate brief by *J. A. Eggen,* for *Harkins;* and oral argument by *Mr. F. C. Eschweiler* and *Mr. Eggen.*

On the appeal of *Harkins* there was a brief by *Turner, Pease & Turner* and *Hoyt & Olwell,* for the respondents

*Mathews* and *Taylor;* and on the appeal of *Itzel* and *O'Keeffe,* by *Turner, Pease & Turner* for *Taylor,* and *Hoyt, Doe, Umbreit & Olwell* for *Mathews.* There was a separate brief signed by *W. J. Turner,* for the respondent *Taylor.* The cause was argued orally by *F. M. Hoyt* and *W. J. Turner.*

WINSLOW, J. In the present action a deed of valuable real estate, purporting to have been executed by an old and feeble woman upon her deathbed, in favor of her companion, is attacked as obtained by fraud and undue influence. These charges were found true by the trial court and the deed was declared void, and from this judgment the grantee appeals.

Before proceeding to the consideration of the merits of the case we shall consider certain questions raised as to the rulings of the trial court upon the admission of evidence. The deed in question bears date on the 2d day of September, 1898. Mrs. Abbey was then very sick and confined to her bed and died two days thereafter. The deed was prepared by Mr. C. T. Heydecker, an attorney residing and practicing at Waukegan, at the request of *Miss Itzel* and Mr. Braunschweiger. The certificate of acknowledgment certified that Mrs. Abbey acknowledged that she signed, sealed, and delivered the instrument as her free and voluntary act for the uses and purposes therein set forth, and was signed by Mr. Heydecker as notary public. Upon the trial of the action, after the examination of the plaintiff, *Winn,* Mr. Heydecker was called as a witness and was allowed to testify, against objection, in substance, that Mrs. Abbey did not speak, nor express by look or act any consciousness whatever of the character of the transaction at the time the deed purports to have been executed; that she could not sign her name; and that he wrote it, and Braunschweiger lifted her hand and put it on the pen while he (Heydecker) made the mark. Thus the officer was allowed to falsify his own official certificate, and this ruling is assigned as erroneous. The question has not been directly

passed upon by this court, so far as we have been able to dis-
cover. In other jurisdictions authorities are quite evenly di-
vided on the question. 1 Am. & Eng. Ency. of Law (2d ed.),
562, notes 1, 2; 1 Cyc. 626, notes 46, 47. The authori-
ties which hold such testimony inadmissible do so upon the
ground that it is against public policy to allow a public officer
to undermine by oral testimony his official certificate, upon
the integrity of which rights of third persons may depend,
and there is force in the argument. Certainly such testimony
is thoroughly impeached by the witness himself. It might
probably be termed a "gross impropriety," as was said by the
court in *Loughney v. Loughney,* 87 Wis. 92, 58 N. W. 250,
where the scrivener and witness to a will, who was named as
executor therein and presented the same for probate, testified
that the testator lacked mental capacity to make a will. Still
we have not been able to convince ourselves that such testi-
mony should be entirely excluded. It is not likely that it will
be frequently offered. Few public officials would desire to
thus impeach their own integrity. Circumstances might eas-
ily arise, however, which would justify, if not demand, its
admission. Prior to 1878 an assessor was freely allowed to
impeach the truth of his own sworn affidavit upon the assess-
ment roll, and it was deemed necessary to pass an act of the
legislature to stop the practice. *Schettler v. Ft. Howard,* 43
Wis. 48; Laws of 1878, ch. 334, § 12; *Plumer v. Marathon
Co.* 46 Wis. 163, 50 N. W. 416. We are inclined to hold the
testimony admissible, but we also hold that in the absence of
a satisfactory explanation by the officer showing that the offi-
cial certificate, though mistaken, was honestly made at the
time (and there was no such testimony here), such testimony
should receive little weight. *Wilson v. South Park Com'rs,*
70 Ill. 46.

Quite a number of exceptions were preserved to the rulings
of the trial court admitting certain evidence, and exceptions
were likewise preserved to rulings by which the hearing of

the case was reopened after argument had begun, and the testimony of additional witnesses allowed to be taken. It is not deemed necessary to state these rulings in detail. As to the first class of rulings above referred to, it is very well established that a judgment in an equitable action will not be reversed merely for the erroneous admission of evidence. This court upon appeal will simply ignore the evidence wrongly admitted. As to the second class of rulings, it is sufficient to say that the conduct of the trial is in the sound discretion of the trial court, and that the record before us does not show that there was abuse of discretion in the present case in allowing the case to be opened after it was formally closed, and allowing the introduction of further evidence.

The plaintiff was the first witness sworn in the case. He produced the deed of trust and stated in what manner he had dealt with the property. He produced also the will and codicil, and they were received in evidence, together with the probate proceedings in the Milwaukee county court. He also produced *Miss Itzel's* deed, or the record thereof, and offered the same in evidence, and stated that the defendants *Taylor* and *Mathews* had objected to his making a deed to *Miss Itzel*. He also stated the amounts and dates of the judgments in favor of *Harkins* and *O'Keeffe,* and here his direct evidence closed.

The plaintiff is an attorney at law, and brought this action in his own proper person for the purpose of obtaining direction from the court as to his duties as trustee under the trust deed. Neither in his complaint nor in his opening testimony did he show any personal interest in the controversy. While he was nominally the plaintiff in the action, he was really a stakeholder only, and the actual litigation was between *Miss Itzel,* on the one side, and the respondents *Taylor* and *Mathews,* on the other side. In his direct testimony he did not give any evidence bearing on the merits of the contest, but contented himself with merely bringing before the court the

situation of the trust and the trust property and the claims of
the contending parties.   After his direct testimony was closed
he was cross-examined in turn by counsel for the various claim-
ants; and the cross-examination on behalf of the appellant
*Itzel* covers many pages, and covers practically all the trans-
actions between the witness and Mrs. Abbey, and between the
witness and *Miss Itzel* and Braunschweiger, both before and
after the death of Mrs. Abbey.   It seems somewhat doubtful
whether the law would justify so extensive a cross-examina-
tion upon subjects not even mentioned in the direct examina-
tion, had objection been made.   Ordinarily the cross-exam-
ination of a witness should be confined to matters brought out
upon the direct examination.   In case the witness is also a
party to the action, a somewhat broader range is allowed.
*Sullivan v. Collins,* 107 Wis. 291, 83 N. W. 310.   While the
witness here was a party to the action, he was only nominally
such; and it may well be doubted whether, in the application
of the rule as to cross-examination, he should be considered as
in any different class from the ordinary witness.

The appellant assigns three errors in the rulings of the court
upon the cross-examination of *Winn,* which will be briefly
noticed.

(1) It appeared that proceedings for the settlement of the
estate of Mrs. Abbey were first begun in Lake county, Illinois,
and then abandoned; and appellant's counsel asked what was
the object of having probate proceedings commenced in Wau-
kegan, and objection to the question as not cross-examination
and as immaterial was sustained.   Certainly the question was
not cross-examination of any matter referred to in the direct
examination, but it further appears that later in the case the
witness was allowed to state, in substance, that the reason ad-
ministration proceedings were begun in Illinois was because
it was feared that large and baseless claims against the estate
might be filed in Milwaukee, and because *Miss Itzel* and
Braunschweiger thought something might be saved in the way

Winn v. Itzel, 125 Wis. 19.

of taxes on the estate if administration were begun in that state.

(2) The appellant's counsel asked *Mr. Winn* to produce any letters from Mrs. Abbey which he then had in his possession in the court room, and he declined on the ground of privilege as attorney, and the court ruled that there was no law to compel such production, and sustained the objection. Immediately thereafter it appeared that the witness had but one letter with him, and that it was merely a friendly letter, and it was produced and received in evidence. Afterwards he stated that he had some other letters from her at his office, and, when asked if he would produce them, he objected on the ground that they were addressed to him as her attorney. Here the matter dropped. There was no ruling or exception. It may well be that there were letters which should have been received, but the counsel did not go far enough in this record to present the question. He should have given formal notice to produce, or at least he should have demanded their production, basing such demand on a statement of what he expected to be able to prove, and then he would have obtained a ruling of the court and an exception. As it was, his only exception was taken to an abstract statement of the court with regard to a letter which was afterwards produced and received without objection. So it is evident that there was no prejudicial ruling here on any theory.

(3) It appears that, after probate proceedings were begun in Wisconsin, the appellant filed objections to the appointment of *Mr. Winn* as executor of the will, and that she met *Mr. Winn* at Milwaukee February 1, 1899, and a written agreement was made between the appellant and *Mr. Winn,* by which, among other things, *Winn* agreed that after his appointment as executor, and after appraisal, he would deliver to a trustee the articles of personal property bequeathed to the appellant, and the appellant agreed that she would withdraw her objections to *Winn's* appointment and aid in the

settlement of the estate. After the proof had been made of the making of this agreement, appellant's counsel asked *Mr. Winn* whether he had the receipt given by *Miss Itzel* on the payment of her legacy to her, and an objection to the question was sustained. How that receipt, if given, would throw any light on any of the issues in this case was not even suggested, nor is it suggested in the brief in this court. There was plainly no error in this ruling.

One further ruling excluding testimony remains to be noticed. *Mr. Winn* testified that he took his account as trustee to Waukegan with him on the afternoon of September 1, 1898, in order to have it approved by Mrs. Abbey, and he denied that anything was said at that time about a description of the Eighth street property (this was the name applied to the property in litigation), or that he would cause a description of the property to be sent from Milwaukee so that it could be put in a deed to *Miss Itzel.* One C. D. Marks, an attorney officing with the plaintiff, was afterwards called as a witness, and testified that, by *Mr. Winn's* request, he (Marks) brought the account to Waukegan on a later train, and he was asked as to conversations with plaintiff that evening at Waukegan; the object being to show that *Winn* instructed him to send a description of the property to Waukegan, and thus to contradict *Winn's* statement that he heard no talk about the proposed deed to *Miss Itzel.* Objections to these questions were sustained on the ground that the communications were confidential. We do not appreciate the force of the objection made, and think that the testimony should have been admitted; but in the view we have taken of the merits of the case it will be seen that the ruling becomes of no importance.

Two minor findings are excepted to, namely, the finding that Mrs. Abbey was eighty-two years of age at the time of her death, and the finding that *Miss Itzel* was employed by Mrs. Abbey upon a fixed salary. There is no great materiality as to the exact age of Mrs. Abbey. It is admitted that she was

more than seventy years of age. The material question is as to the strength of her will and faculties rather than as to her age. The second finding referred to is in exact accord with the evidence.

This brings us to the consideration of the general question of the sufficiency of the evidence to sustain the findings of the court to the effect that the deed to *Miss Itzel* was procured by fraud and undue influence on the part of Braunschweiger and *Miss Itzel*. There was an absence of direct evidence of fraud or undue influence, unless, indeed, the testimony of the witness Heydecker be so considered. No witness testified to any word of abuse or blandishment which had for its object the obtaining of this deed. The circumstances under which the deed was admittedly signed were relied on by the respondents as being sufficient to justify the finding of actual fraud, under the rule stated by this court in the case of *Davis v. Dean,* 66 Wis. 100, 26 N. W. 737. The trial court agreed with this contention and the appellant takes sharp issue with it. The question is first presented in this way: After the court had heard the testimony of the plaintiff, C. T. Heydecker, Lizzie Brean, and Mrs. Heydecker, the question whether the burden of proof had shifted to the appellant *Miss Itzel* appears to have been raised and discussed. Whether any definite motion of any kind was made, or whether it was merely an academic discussion, does not appear; but the trial court finally stated it to be his opinion that the burden of proof had shifted to the defendant *Itzel* to show the fairness of the transaction. To this ruling exception was taken and it is now assigned as error. Immediately upon the making of the ruling the appellant assumed the burden of the case and proceeded to put in her testimony. This practice seems somewhat singular, and apparently indicates some confusion of ideas on the part of both court and counsel as to the effect of the doctrine laid down in the *Davis v. Dean Case,* and approved with some modifications and explanations by subsequent cases. See *Small v. Cham-*

*peny,* 102 Wis. 61, 78 N. W. 407 ; *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939. We do not understand that the principle there approved changed the practice in fraud cases, or affected the order of the trial of such cases. Parties who charge fraud must prove fraud after as well as before that decision. They still have the burden of proof. It was simply held in that line of cases that when a plaintiff, charging fraud, had proven certain facts, he had made a *prima facie* case, though he might not have produced any direct evidence of fraudulent acts or words, and he might then rest his case, and the defendant must then rebut the inference of fraud so raised by affirmative proof of good faith. After as well as before that decision it was incumbent on the plaintiff to make his case in the first instance, and to present all the proof which he had and wished to present tending to prove fraud, whether circumstantial or direct. After as well as before that decision it was the duty of the court at the close of the plaintiff's case to decide whether a *prima facie* showing of fraud had been made, if the question was raised by proper motion on the part of the defendant. After as well as before that decision, in case the trial court held that a *prima facie* showing of fraud had been made, the defendant could either stand upon the plaintiff's proofs and challenge their sufficiency in this court, or he could introduce his own proofs tending to rebut the plaintiff's case and establish his innocence. In this sense, and in this sense only, the burden of proof shifts. When the plaintiff makes a *prima facie* case, entitling him to relief if the proof stops there, the defendant must take up the burden and meet the case so made by other evidence. This is the case in all contests of fact. It is not peculiar to fraud cases. The rule of *Davis v. Dean* did not change the long-established rule nor did it tend to do so. It simply announced what facts would be considered as *prima facie* proof of fraud, requiring explanation by the defendant. *Small v. Champeny, supra.*

So the practice which seems to have been adopted in the

instant case, by which the plaintiff introduced a part of his proof and then insisted that the burden of proof had been arbitrarily shifted to the defendant's shoulders and must be accepted by him, notwithstanding the plaintiff had affirmative evidence still in reserve, cannot be approved. The burden of proof does not play hide and seek in this way in a fraud case any more than in any other case. But while the practice adopted here was erroneous, still, if all the material proof offered by all of the parties was ultimately received, and it appears by such proof that the circumstances were indeed such as to raise a legitimate presumption of fraud, and that the defendant has not overcome that presumption by affirmative proof, there will be no reversible error. This, therefore, is the question to be considered.

Reference to the adjudicated cases following the lead of *Davis v. Dean, supra,* in this court, and which are cited in *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939, very clearly shows the difficulty—nay, the practical impossibility—of laying down any exact rule or rules for determining what particular circumstances, when proven, will raise the inference of fraud. The circumstances will naturally vary with the infinite variety of human transactions and human relationships and surroundings. In the case of *Loennecker's Will,* 112 Wis. 461, 88 N. W. 215, it was said that, in order to raise this presumption, "there must be shown a subject unquestionably susceptible to undue influence, either as the result of old age, mental weakness, or both; also some clear evidence of opportunity, and a disposition on the part of the beneficiary to exercise such influence. When these facts are shown, and especially when they exist with other facts out of the usual course of business transactions of such a nature, the presumption will arise which will put the beneficiary to his proof of good faith." In a general way there seems little fault to be found with this statement of the rule; it being understood that "opportunity" here does not mean mere phys-

ical propinquity or possibility of personal contact, but the fact that interviews or personal transactions between the parties were had, followed by the accomplishment of the desired end, as suggested in *Vance v. Davis, supra.*

With this general statement of the requirements of the proof in such cases it will be necessary to review the evidence to see whether it supports the findings of the court. The evidence impeaching the deed offered by the defendants *Mathews* and *Taylor* tended to show the following facts, which are more or less relevant to the present inquiry: That prior to the year 1896 the deceased, being a childless widow, between seventy and eighty years of age, and possessing a comfortable income derived from real property in Milwaukee, lived in her own house in that city, with her servants, her household affairs being managed by the witness Braunschweiger, a trusted employee, who had been with her and her deceased son a number of years; that Mr. Geilfuss, a banker, managed her business affairs; that she was fond of showy dress and addicted to the use of liquor, sometimes to excess; that she was peculiar in some ways, excitable, and susceptible to flattery; that for a short time in 1896 she expressed fear of Braunschweiger, which feeling after two or three months subsided; that in the summer of 1896 she became acquainted with *Miss Itzel,* a music teacher in good standing in Milwaukee, and induced her to come and live with her as a companion; that the household thus made up continued to exist in apparent harmony until Mrs. Abbey's death; that in September, 1896, Mrs. Abbey made a will (revoking a former will) by which she gave $2,000 to Braunschweiger and $1,000 to *Miss Itzel,* the will being drawn by the plaintiff, *Winn,* who soon thereafter became the manager of her business in place of Geilfuss and so continued till her death; that in June, 1897, Mrs. Abbey executed a codicil to her will by which she increased Braunschweiger's legacy to $3,000 and added $1,000 to the legacy of *Miss Itzel,* together with jewelry and household furniture,

and gave $3,000 to the plaintiff, *Winn;* that at the same time she made a trust deed of her property to *Winn,* as stated in the statement of facts, *supra,* and made a written contract with *Miss Itzel* by which *Miss Itzel* was to remain with Mrs. Abbey during life, as companion and nurse, for the sum of $25 per month; that *Miss Itzel* was constantly with Mrs. Abbey as her companion, and that she modified Mrs. Abbey's showy manner of dress; that Mrs. Abbey relied on Braunschweiger and *Miss Itzel* for the conduct of her domestic affairs, and that, in *Mr. Winn's* opinion, *Miss Itzel* did her whole duty by Mrs. Abbey, and that Mrs. Abbey's confidence in and affection for both was great; that Mrs. Abbey wrote a letter to *Mr. Winn,* September 28, 1897, stating her desire to deed the Eighth street property to *Miss Itzel* for her kindness; that *Winn* afterwards asked Mrs. Abbey if he should convey the land to *Miss Itzel,* and she simply said: "No; I am not dead yet. I am capable of taking care of my own property while I live;" that *Winn* went to Europe in the spring of 1898, leaving Mrs. Abbey in good health; that she remained in usual health till late in August, when she fell ill of dysentery; that *Winn* returned August 31, 1898, and on the following day went to Waukegan with his account and found her ill, but that she audited his account and indorsed a check; that on the 2d of September *Miss Itzel* called upon Heydecker and asked him to make a deed of the Eighth street property, which he did, and brought to the house; that this deed was in form executed by Mrs. Abbey (Heydecker testifying, however, in contradiction of his certificate, that she was not conscious and did not acknowledge it); that she was undeniably very weak and unable to write or hold a pen; that only Braunschweiger, Heydecker, *Miss Itzel,* and the nurse, Miss Pettifoe, were present; that she died on the second day following, in great suffering. There was no direct testimony that either *Miss Itzel* or Braunschweiger had ever said a word, by way of threat or blandishment, to induce the execution of the deed, nor was

there any testimony that *Miss Itzel* had ever treated Mrs. Abbey improperly. There was some testimony given by Ida Voct, a servant who lived with the family in 1896, to the effect that Braunschweiger at that time shamefully ill-treated Mrs. Abbey, and whipped her, and that he and *Miss Itzel* lived in adulterous relations from the first day *Miss Itzel* entered the house; but we have been unable to give credence to this testimony, not only on account of its inherent improbability, but also from the fact that it is completely contradicted and discredited by practically all the other evidence, both oral and written, in the case. There was practically no evidence worthy of mention which tended to show that Mrs. Abbey was of unsound mind or incapable of understanding a business transaction at any time prior to the day on which the deed to *Miss Itzel* was executed.

It seems extremely doubtful whether this evidence raises a *prima facie* case of fraud, within the rule above stated, but we do not find it necessary to decide the question. Conceding, for the purposes of the case, that it is sufficient, we will proceed to consider the evidence adduced in support of the good faith of the transaction. In this connection we will first consider the question whether Mrs. Abbey was conscious when the deed was presented to her for signature. Upon this inquiry we have first the fact that the deed, on its face, is properly acknowledged and certified by an authorized officer of the law. It is well settled that the evidence must be perfectly clear, convincing, and satisfactory in order to justify a court in holding that the certificate of acknowledgment is false. *Linde v. Gudden,* 109 Wis. 326, 85 N. W. 323. Bearing in mind this rule, we find that the only evidence tending to impeach the certificate of the officer is that of the officer himself. The very unsatisfactory character of this evidence has been previously referred to, and, even if no evidence were introduced to support the certificate, we cannot think that it should be held to be successfully falsified by such self-impeaching statements.

But there is considerable evidence tending to support the certificate and show that the deceased was conscious of her acts. There was present in the room a trained nurse, Miss Pettifoe, evidently a lady of education and culture, absolutely disinterested, and peculiarly fitted by her education and calling to judge of the mental condition of the deceased. She also signed her name as witness to the deed. Her testimony was full and apparently frank and was not shaken upon cross-examination. Without rehearsing it in detail, it can be said it was to the effect that, while Mrs. Abbey was very feeble, she was perfectly conscious, joined in the conversation, was apparently perfectly cognizant of the transaction, and, in reply to the questions of the officer, announced her entire satisfaction with the conveyance and its purpose, and tried to write her name with the pen, only desisting because of physical weakness. This testimony is corroborated by that of Braunschweiger and *Miss Itzel,* the only other persons present, but who were, of course, interested witnesses. Miss Pettifoe also testified that when Mrs. Abbey took the pen she tried to write the letter "M," and made some scratches with the pen upon the deed in that attempt. The original deed, which was introduced in evidence, shows upon the first line prepared for the signature of the grantor a number of irregular pen scratches, which seem perfectly to correspond with Miss Pettifoe's statement of the fact, and which are entirely unexplained on any other theory. Braunschweiger testified also that, when Heydecker wrote Mrs. Abbey's name, she (Mrs. Abbey) told him he had spelled "Matilda" wrong, whereupon he (Heydecker) corrected the spelling. Examination of the deed shows that a change was made in the spelling of the name; it having been once "Mathilda," and then evidently changed to Matilda. In the face of all of this evidence tending to support the certificate of acknowledgment, it cannot be reasonably claimed for a moment that the unsupported, self-

impeached testimony of Heydecker will suffice to falsify his own certificate of acknowledgment.

This question is not, however, decisive of the case. The deed may have been properly acknowledged and executed by Mrs. Abbey while conscious and sane, and yet her act may have been the result of previously exerted undue influence or duress, or both, and to this question we now turn. As before stated, there is no direct evidence in the case of any word or act on the part of *Miss Itzel* which could be construed as a threat or a solicitation to make such a conveyance. It is said that it was an unnaturally large gift to one not of kin to the deceased, especially after provision had been made for the donee by will and increased by a recently executed codicil. There is, perhaps, some force to this consideration. Had Mrs. Abbey left descendants who would naturally be expected to come into the estate, or had the estate been relatively small, the argument would have considerable weight. But this was not the case. Mrs. Abbey had an estate of about $140,000. She left no direct heirs. Her relatives were in the east and had no part in taking care of her during her declining years. The subtraction of property worth $9,000 from her estate to compensate a faithful companion would not be intrinsically strange or unjust to any one. *Miss Itzel* had constantly attended her for more than two years; giving up her own calling upon what seems very modest, if not inadequate, compensation. *Mr. Winn* testifies that Mrs. Abbey's affection for *Miss Itzel* was great, and that *Miss Itzel* did her whole duty by Mrs. Abbey; and this is borne out by *Mr. Winn's* correspondence with *Miss Itzel,* which continued up to September 21, 1898, when he wrote a letter to her stating that nothing had been omitted by her which could in any way contribute to Mrs. Abbey's pleasure, happiness, and peace of mind, and that "you and Carl deserve and are entitled to much credit and to the everlasting gratitude of every one in-

terested in her [Mrs. Abbey's] welfare." In view of all these facts, the desire of Mrs. Abbey to further compensate *Miss Itzel* does not seem particularly strange or unnatural. If it appeared, however, that there had been no thought on Mrs. Abbey's part of the making of such a gift prior to the day of the execution of the deed, the argument that some undue influence had been exerted just as Mrs. Abbey was about to die would have some considerable weight. The testimony shows, however, that for at least a year Mrs. Abbey had this idea in mind. The letter of September 28, 1897, written by Mrs. Abbey to *Mr. Winn,* has already been referred to. The genuineness of this letter was rather feebly questioned by *Mr. Winn* in his testimony, but he answered it at once and always treated it as genuine, and there is absolutely no evidence which would justify a finding that it was forged or did not express Mrs. Abbey's actual desire. Moreover, the original letter is preserved in the bill of exceptions, and, upon comparison with the admittedly genuine letters, bears every mark of authenticity. In this letter she says, "I am certainly pleased to know we can pay all indebtedness in November or December, so that I can get the Eighth street property cleared, as I intend *Miss Itzel* to have this to show my gratitude for her loveliness in being with me, sacrificing her home feelings for me." It seems that there was an incumbrance on this property, and Mrs. Abbey's idea, according to this letter, was that she would deed the property to *Miss Itzel* when the incumbrance was removed. Exactly in accord with the idea expressed in this letter is the testimony of Mrs. Salina Maegerlein, a lady entirely disinterested, well acquainted with Mrs. Abbey for years in Milwaukee, and who visited her in her home in Waukegan some two or three weeks before her death. Mrs. Maegerlein testifies that Mrs. Abbey was in very good health; that she played on the piano, and sang, and recited a poem, and took a walk with her out of doors; that she spoke to her of the Eighth street property, and complained that *Mr.*

*Winn* had stayed in Europe nearly four months when he only expected to stay two months; that he hadn't cleared the property of the mortgage, and she was displeased about it because she wanted to give this property to *Miss Itzel* as a reward for her work. Another disinterested witness, Mrs. Alden, a neighbor at Waukegan, testified to a conversation with Mrs. Abbey during the same month of August, in which she said, in substance, that she wished *Mr. Winn* would hurry up and come home because she wanted her property fixed; that she wanted everything fixed for *Anna's* good. The testimony so furnished by the letter and the two witnesses Maegerlein and Alden is perfectly consistent, no reason appears to question its credibility, and it seems to quite well establish the fact of Mrs. Abbey's long-standing desire to do the very thing now attacked, without any reference to the testimony given by *Miss Itzel* herself and Braunschweiger, which is definite and full to the effect that at numerous times Mrs. Abbey talked with *Mr. Winn* about clearing the title of the Eighth street property so it could be deeded to *Miss Itzel*. Thus, as it seems to us, the only really suspicious circumstance in the transaction, namely, the delay in the execution of the deed until a day or two before Mrs. Abbey's death, is quite fully and satisfactorily explained; that is, it appears that she was waiting for the return of *Mr. Winn,* her business man, from Europe, and it appears that, when he did return, the description of the property was at once procured and the deed executed.

On the whole, we entertain no doubt that, if the burden of proof was cast on the defendant *Itzel* by the making of a *prima facie* case against her, it was quite fully and fairly lifted by the evidence which we have referred to, and hence that the judgment was erroneous. There are some unpleasant and unexplained features of the case with reference to the commencement of probate proceedings in the probate court of Lake county, Illinois, upon a petition signed by Mr. Heydecker, in which he stated under oath on the 22d day of Oc-

tober, 1898, that Mrs. Abbey died, leaving no will and leaving personal estate valued at $1,000, which we have not referred to at length, for the reason that they seem to have little or no bearing upon the issue here. There is positive testimony that Mr. Heydecker was informed on September 2d that there was a will, and it seems inconceivable that he had not learned the fact before October 22d. Certainly he must have known that her estate was large; and this whole transaction smacks strongly of a scheme to suppress the will and administer the estate as intestate. This apparent attempt to deceive the probate court of Lake county is not pleasant to comment upon, though it may perhaps be susceptible of explanation. Standing unexplained as it does in the record before us, it tends to throw additional discredit upon the testimony of Mr. Heydecker. It appears from the evidence that this attempt to administer the estate as intestate in Illinois was balked by a petition filed by *Miss Itzel,* in which it was stated that Mrs. Abbey died testate, and the letters of administration which had been issued to Heydecker were revoked. How much *Mr. Winn* knew of this transaction does not fully appear, but it seems that he had some knowledge of it, and it is somewhat significant to note that after this time his relations with *Miss Itzel,* which up to that time had been uniformly friendly, became strained and apparently unfriendly.

We have, perhaps, spent too much time in discussing mere evidence. We are slow to set aside the findings of fact of a trial court, but it is our duty to do so if we are convinced that they are against the clear preponderance of the evidence, and of that fact we are convinced in the present case.

*By the Court.*—Judgment reversed upon all the appeals, and cause remanded with directions to enter judgment directing the trustee to deed the property in dispute to the defendant *Itzel* and dismiss the cross-complaint of the defendants *Taylor* and *Mathews.*