CHAMPEAU, by guardian, Respondent, vs. CHAMPEAU and another, Appellants.

*May 2—May 21, 1907.*

*Setting aside deed for fraud: Undue influence: Evidence: Burden of proof.*

1. In its decision setting aside a conveyance of land the trial court reviewed the evidence, stating that it inferred therefrom that the grantee exercised an influence over the grantor to induce him to make the deed which, under the circumstances, deprived the grantor of his free will to act in the matter, and that thereby the grantee obtained an unconscionable advantage over him. The court then said that the grantee had failed to satisfactorily show that the grantor fully understood what he was doing in deeding away his property and that the deed was not obtained by undue influence over the grantor, but that "were the burden of proof on the plaintiff the result might have been different." *Held,* that this did not show any error in applying the rule as to the burden of proof, the plaintiff having made a *prima facie* case entitling him to relief and it being then incumbent on defendant to rebut the inference of fraud so raised.

2. A finding by the trial court to the effect that a conveyance of land was obtained by the grantee from his weakminded younger brother by the exercise of undue influence, is *held* to be sustained by the evidence.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Affirmed.*

This is an action to set aside a deed by which plaintiff conveyed an interest in lands to the defendant *Frank Champeau,* who in his turn had conveyed to his wife, *Emma Champeau.* The plaintiff, *Louis Champeau,* and the defendant *Frank Champeau* are brothers and are the children of Emanuel and Adeline Champeau, who owned separate parts of the farm on which they resided, situate in the town of Howard, Brown county. *Frank* was the eldest of nine children. On March 30, 1884, being then advanced in years and infirm in health, both of the parents made wills. The mother died February 11, 1890, and her will was probated in March, 1903. By

this will she bequeathed $20 to each of her daughters and $5 to each of her sons Fred and Dempsey, and the residue of her property was given to *Frank* and *Louis* in equal shares, upon condition that these two sons care for and maintain her husband Emanuel during his life and provide him a proper burial, and the further conditions that they support and educate her daughter *Leocadie,* if she remained living with them on the farm, and that they care for and support her grandson John Fournier until he should attain the age of twenty-one years. The father's estate went to the nine children as intestate estate.

*Frank* remained on the farm most of the time and helped support his parents. He contributed the larger portion of what he earned away from home to the support of his parents. After *Louis* left home in 1886 *Frank* remained with them and cared for them in their ill health and during their declining years. The other members of the family left the parental home early in life and thereafter rendered no financial aid to their parents. *Louis* left home some time during the year 1886. His whereabouts were unknown for about three years. He then wrote *Frank* that he was in a hospital in Montana and needed financial assistance. Thereupon his brother Dempsey visited him, and found him at the hospital receiving treatment for an affliction of the eye, which finally necessitated its removal. Dempsey informed *Frank* of the condition of *Louis,* and *Frank* then sent *Louis* $100 as requested. When the father died in 1892 *Frank* made an effort to find *Louis,* but did not succeed. *Louis* remained away from the old home until 1902.

*Frank* secured conveyances from all the heirs of their interests in the parents' estates in 1892. The mother's will was not probated until 1903, after the trouble arose concerning the property which resulted in this suit. Whether *Frank* had always had it in his possession is not clear. He either had it in his possession or it was in the hands of his sister.

On May 10, 1892, while *Louis* resided at Concentrado, Montana, *Frank* secured a quitclaim deed to himself from *Louis* of his interest in his parents' property. It appears that *Frank* received a letter from Montana informing him that *Louis* was ill and in need of assistance. A few days thereafter *Frank* went to Montana and took with him the copy of the quitclaim deed which *Louis* thereafter signed and executed. When *Frank* arrived at Concentrado on May 9th he found *Louis* engaged in the saloon business with another, and doing manual labor for others, such as chopping wood. *Frank* and *Louis* were together during the afternoon and evening of this day, and together occupied *Louis's* bed that night. During the night they talked over family and property affairs and the proposition of *Louis* deeding his interest in the estates of his parents to *Frank*. The next morning they walked to Superior, a distance of four miles, for the purpose of having *Louis* make a transfer of his interest in his parents' estates to *Frank*. The subject had evidently been discussed, and was discussed on this trip. Upon arrival at Superior they immediately went to the office of J. C. Bower, a justice of the peace, before whom a quitclaim deed was executed and acknowledged. At this time *Frank* paid *Louis* some money. After having their photographs taken and after *Frank* had given *Louis* some money to pay for them, *Frank* departed on the noon train for his home, where he arrived on May 14, 1892. He spoke of the matter to his sister *Leocadie* and to his nephew John Fournier, showed them the deed, and exhibited the signature of *Louis* to his sister. *Louis* confirms this transaction in his testimony on the stand at the trial of this case, and expressed his satisfaction with the transaction. The court found the value of the property so conveyed by *Louis* to *Frank* to have been $1,500 at the time of the transfer.

In the year 1891 a tree fell on *Louis* and injured him and caused the loss of an eye. He thereafter suffered from mountain fever and was delirious the following winter. There is

evidence tending to show that at about the time of the execution of the deed *Louis* was addicted to gambling and that he exercised little mental control; that he was confirmed in his intemperate habit of drinking, and that his mental condition was weak; that he displayed eccentricities which he had not shown before his sickness in the West; that he suffered from severe and repeated headaches; and that he was irritable, stubborn, and talked at random.  A number of witnesses who had known him for some time before the execution of the deed testified that he was not competent to transact business and comprehend his relation to his property sufficiently to protect himself.  There was testimony that he had mental vagaries concerning financial matters and manifested an uncontrollable desire for gambling; that immediately after receiving the money from *Frank* in consideration of the conveyance he squandered it in a drunken debauch, and then reproached himself for selling his birthright.  About two years after the deed was executed he was committed to an insane asylum in Montana, where he remained for some time.  He is now in the asylum for the insane at Oshkosh, where he has been since 1903.

The court found, among other facts, that *Louis* was never very bright, and that he had had a stroke of paralysis in his early manhood; that at the time of deeding the property to *Frank* he was mentally so weak as to render him incapable of fully appreciating the import of his acts; that he was readily susceptible to undue influence, and especially to that of his brother *Frank;* and that *Frank* at the time of the transfer paid *Louis* not to exceed $400 for his interest, which was wholly inadequate to cover its actual value.  The court found that the conveyance from *Frank Champeau* to his wife on January 16, 1896, was without consideration, and that she holds the property for his benefit and in trust for him, and that *Frank Champeau* has never in fact released his ownership and control of the property so pretended to be conveyed.

The court awarded judgment in plaintiff's favor, adjudging the conveyances from *Louis* to *Frank* and from *Frank* to his wife void, and directed a reconveyance by *Frank* and his wife to *Louis* of his interest and for plaintiff's costs of the action against *Frank*. This is an appeal from such judgment.

For the appellants there was a brief by *Wigman, Martin & Martin,* and oral argument by *J. F. Martin.*

For the respondent there was a brief by *Cady & Strehlow,* and oral argument by *Samuel H. Cady.*

SIEBECKER, J. The grounds upon which plaintiff by his guardian claims relief canceling the deed from him to his brother *Frank* and restoring him to his rights in the property conveyed are that he was mentally incompetent to make the transfer of his property at the time, and that the defendant *Frank Champeau* fraudulently procured this transfer to himself by the exercise of undue influence over him. The facts and circumstances set out in the foregoing statement show the relationship of the parties and present the transactions and conduct of the parties pertaining to and involved in the questions litigated upon the trial. The court found that the plaintiff, *Louis Champeau,* was not insane or so weak mentally at the time of the transfer of his property to his brother as to wholly incapacitate him from making the transfer, but that he was at that time so weakminded and infirm a person as to render him peculiarly susceptible to the influence of others in matters concerning his property and financial affairs. The inferences from the evidence are clear that *Louis* suffered from serious afflictions of the body and mind before the making of the deed, that these conditions had induced a weakness and flightiness of mind, and that he had become habituated to the vices of intemperance in drink and gambling, which had so firm a hold on him that under slight temptation for their indulgence they overcame his self-mastery. The subsequent events of his life, showing a mental and physi-

cal breakdown, tend strongly to support the conclusion of the trial court that *Louis* was quite infirm of mind at the time he transferred his property to his brother.

It is, however, urged that the court's finding that *Frank* procured this deed through fraud by unduly influencing *Louis* to make the transfer is not sustained, and that an error of the court in applying the rule as to the burden of proof respecting this question led him to the erroneous conclusion of fact as to *Frank's* having exerted an undue influence over *Louis*. This point of appellants' exception to the trial court's disposition of the case seems to rest upon the following sentences in the court's decision:

"The defendant has failed to satisfactorily show that *Louis* fully understood what he was doing in deeding away his property and that the deed was not obtained by undue influence exercised over him by *Frank*. Were the burden of proof on the plaintiff the result might have been different."

This remark was made by the court at the conclusion of an extended review of the evidence and his inferences from the facts. Its meaning is apparent when it is examined in the light of his previous statements that he inferred from the evidence adduced that *Frank* had exercised an influence over *Louis* to induce him to make this transfer, which under the circumstances deprived *Louis* of his free will to act in the matter, and that *Frank* thereby gained an unconscionable advantage over him. Under these circumstances the court evidently applied the rule as stated in *Winn v. Itzel,* 125 Wis. 19, 32, 103 N. W. 220, wherein the court comments on the doctrine laid down in the case of *Davis v. Dean,* 66 Wis. 100, 26 N. W. 737, as modified and explained in subsequent cases, and then states:

"We do not understand that the principle there approved changed the practice in fraud cases, or affected the order of the trial of such cases. Parties who charge fraud must prove fraud after as well as before that decision. They still have the burden of proof. It was simply held in that line of cases

that when a plaintiff, charging fraud, had proven certain facts, he had made a *prima facie* case, though he might not have produced any direct evidence of fraudulent acts or words, and he might then rest his case, and the defendant must then rebut the inference of fraud so raised by affirmative proof. . . . In this sense, and in this sense only, the burden of proof shifts. When the plaintiff makes a *prima facie* case, entitling him to relief if the proof stops there, the defendant must take up the burden and meet the case so made by other evidence."

We are satisfied that the court did not deviate from this rule as to the burden of proof respecting the charges alleged against defendant in the instant case, though the quoted remark, standing alone, might be interpreted as indulging a presumption against defendant not warranted.

It is contended that the evidence does not support the finding that *Frank* unduly influenced *Louis* to make this transfer. True, there is but little direct evidence of what negotiations took place between *Louis* and *Frank* on the afternoon and evening of the 9th of May and the morning of the 10th before the deed was executed. The facts and circumstances disclosed show that *Frank* was an aggressive person, who diligently advanced his interests in the acquisition of property. He had evidently determined to secure *Louis's* interest at this time, if he could be induced to part with it. This appears from his entire conduct and from his taking a blank deed with him on this trip for *Louis* to execute. The witnesses giving direct evidence of *Frank's* and *Louis's* conduct while together in Montana were restricted to what occurred on the morning of the 10th of May, and the evidence indicates that *Louis's* desires for liquor and to secure possession of some money were aroused to an extent which rendered him readily susceptible to slight influences which held out inducements for their gratification. True, he testified, giving a somewhat detailed statement of *Frank's* visit and the transaction of the execution of the deed, that he was satisfied to make the transfer, yet neither

he nor *Frank* made statements showing that any negotiations had taken place between them, or that there was an adjustment of mutual claims or anything in the nature of an accounting or settlement of their joint property affairs. The inferences all point to the conclusion that *Louis* acceded to whatever *Frank* proposed. Their whole conduct tends to show that *Louis* received *Frank's* judgment and suggestions respecting the whole transaction. It is manifest that *Louis* reposed such confidence in his older brother that he followed his advice and did his bidding. A marked circumstance showing his attitude in this respect is his acceptance of a number or a roll of bills from *Frank* when the deed had been executed and in consideration of it, without knowing or attempting to ascertain their amount. He also executed the deed without understanding its nature, except that it had reference to the affairs of his parents' estate. Although he admits he knew he was signing away his interest in the estate, yet he testifies he did not know what his interest was worth and that *Frank* did not tell him. While *Frank's* version respecting these transactions, so far as disclosed, does not directly conflict with his claim that he conferred with and talked over the subject with *Louis,* yet it falls far short of an explanation of the facts and circumstances of the case sufficiently satisfactory to remove the inferences that he induced him to transfer all his interest in the property without his comprehending the full import of his act, and that he did not act freely and voluntarily in this matter. Adding to this the obvious fact that the consideration *Frank* paid for the property was grossly inadequate in view of its actual value, the conclusion is inevitable that the trial court's finding that the deed was obtained by undue influence and should be held void and be set aside and that plaintiff's interest in the property should be restored to him is sustained by the evidence.

*By the Court.*—Judgment affirmed.