WILL OF FAULKS: PATTERSON, Appellant, vs. JENSEN and others, Respondents.*

*November 15, 1944—January 16, 1945.*

---

* Motion for rehearing denied, with $25 costs, on May 1, 1945.

For the appellant there was a brief by *Edward J. Hart* of Waupaca and *Brazeau & Graves* of Wisconsin Rapids, and oral argument by *Mr. Hart* and *Mr. Theodore W. Brazeau.*

For the respondents there was a brief by *Fisher, Reinholdt & Peickert* of Stevens Point, attorneys for Will Jensen, *Paul Roman* of Manawa, guardian *ad litem* for Lorraine Jensen, and *Browne & Browne* of Waupaca, attorneys for Eliza Palmer, Burt Jenner, and Mildred Jenner, and oral argument by *Mr. W. E. Fisher, Mr. Roman,* and *Mr. Tom A. Browne.*

ROSENBERRY, C. J. George and Mary Faulks, the testatrix, husband and wife, having no children, lived upon and operated a farm near Waupaca. In July, 1903, the respondent, Will Jensen, was living at an orphans' home about three miles from the Faulks farm. He was then eleven years of age. He first met Mary Faulks on July 30, 1903, and became a member of the Faulks home the next day and remained a member of the family and household until the time of his marriage to Pearl Jensen in 1919. He was not adopted. The family lived continuously upon the farm except for two years, 1913 and 1914, during which time they lived in the city of Waupaca. After the marriage of Will in 1919, he and his wife moved into the farm home and Mr. and Mrs. Faulks moved to

Waupaca, where they resided until they died. Will and Pearl Jensen have continued to live upon and operate the farm down to the present time. George Faulks died in 1934. Mary continued to live in the home at Waupaca.

George had a sister, Eliza Palmer, and a brother, Rufus Faulks. The sister Eliza was a cripple and the brother had lost his property, was in poor health and in bad shape financially. It appears from the testimony of Will Jensen that some time prior to the death of George Faulks, which occurred on October 31, 1934, George and Mary Faulks duly executed a joint will. This will was in existence after George's death. It has never been probated. It is now lost and the witness, Will Jensen, was permitted to testify to its contents. In admitting the testimony regarding the contents of the will, the court said:

"It is also understood that it [evidence in regard to contents of will] is taken not for the purpose of proving the lost will but merely for the purpose of proving, if it does prove, that there was some change of attitude in the mind of this testator if one did take place. That is the only theory on which I could see it would be material."

Knowledge of the execution of the will and its contents having come to the court and counsel for the proponents and contestants, and the record disclosing no reason for the failure to probate the will, we must in view of the provisions of sec. 310.03, Stats., presume that there was some good and sufficient reason for not probating it. Not to do so would impute to parties, counsel, and court a dereliction of duty.

Sec. 310.03, Stats., provides: "If any person having the custody of any will after the death of the testator shall, without reasonable cause, neglect to deliver the same to the county court having jurisdiction thereof, after he shall have been duly notified by such court for that purpose, he may be committed to the jail of the county by warrant issued by such court and there be kept in close confinement until he shall deliver the will as required."

The presumption is especially applicable in this case for the reason that, after the death of George, there was a conference at which were present Mary Faulks, Pearl Jensen, Mrs. Augusta Larsen, Mr. Hart, attorney for the Faulks, Mrs. John C. Hart, and the witness Will Jensen, who was named executor of George's will. The will may have been revoked. 1 Page, Wills (2d ed.), p. 152, sec. 88. See *Doyle v. Fischer* (1924), 183 Wis. 599, 198 N. W. 763, 33 A. L. R. 733, and note, 739. At this conference apparently the matter of the probate of the will was under discussion, so that the matter must have been fully disclosed to most of the parties in interest. After the conference George's estate was administered as an intestate estate.

In 1936, Mary Faulks made a will whereby she bequeathed $10,000 to Lorraine Jensen, $5,000 to Will and Pearl jointly, $1,000 to Eliza Palmer, and $1,000 to Anna Faulks, and smaller amounts to Arnold Larsen, John, and Augusta Larsen, Matilda Jenner, and Herbert Jenner. She devised her residence property and another house to Will and Pearl Jensen jointly and by the residuary clause provided that the specific legatees should share equally in the residue.

In September, 1940, Mary executed a will whereby she bequeathed Lorraine Jensen $10,000, Will and Pearl Jensen $5,000, with smaller bequests to Eliza Palmer, Tillie Jenner, Bert Jenner, and his wife, setting up a trust for the benefit of Eliza Palmer in the sum of $900, devised her two houses in Waupaca to Will and Pearl Jensen, and made bequests to Arnold Larsen and Augusta Larsen, and appointed Will Jensen as the executor.

In January, 1941, Mary Faulks made a will with substantially the same provisions as the 1940 will except that she gave to Dr. Patterson, the proponent, "all indebtedness that he may owe me at the time of my death." This will was propounded by Will Jensen and is the will admitted to probate.

At the time of Mary Faulks' death in December, 1942, her heir at law was one sister. Her parents had died many years before. One sister died in 1936 and her brother died in September, 1942. The remaining sister, Jane, was single at the time of Mary's death.

In 1934, George was seventy-two years of age. At that time Mary was seventy years of age. Mary died in December, 1942, aged seventy-eight years. Mary's relatives, other than her brothers and sisters, lived in England and Australia.

Will Jensen not only operated the farm, as already stated, but down to January, 1942, he was treated by George and Mary as a son and he fulfilled the obligations of a good son to his foster parents. He assisted them in the conduct of their business affairs, looked after them during their illness, had access to their papers, looked after the repair of their residence, did odd chores for them, and in case of illness saw that they were properly cared for. His wife co-operated with her husband in the care of Will's foster parents and both were on excellent terms with George and Mary. Pearl Jensen, prior to her marriage, lived on a farm near the Faulks' farm and she had known them practically all her lifetime. Will and Pearl had one child, Lorraine, who was eighteen years of age at the time of Mary's death. Mary was very fond of Lorraine, often referred to her as her granddaughter, and when Lorraine graduated from high school in 1941, Mary offered to pay for her attendance at the University of Wisconsin for one year. While Lorraine was attending high school in the city of Waupaca, she had her noon meal with Mrs. Faulks and occasionally stayed there over night and was on good terms and was very much beloved by both George and Mary Faulks.

Dr. Patterson, the proponent of the will executed in January, 1942, came to Waupaca from Ohio in July, 1932, to begin the practice of medicine, at which time he was twenty-eight

years of age. He first met Mary Faulks in 1937, attended her as a physician once in July, 1937, and in 1940 became her regular physician. In 1936, he purchased a house on Berlin street in Waupaca, for $4,000. In 1940, he bought a house on the corner of Lake and Berlin streets, at which time he still owed $2,600 on the mortgage on the Berlin street house. At the time he bought the house at the corner of Lake and Berlin streets, Mary advanced him the sum of $8,600, $2,600 being used to pay the mortgage on the Berlin street house, and $6,000 to pay for the house at the corner of Lake and Berlin streets. To evidence this $8,600 transaction, he gave Mrs. Faulks his note for $4,000 and a mortgage upon the corner house to secure the note which left the Berlin street house clear of incumbrance. Mrs. Faulks received no written evidence respecting the $4,600 not covered by the $4,000 note.

Toward fall in 1940, Mary requested Will to go to the bank and get a draft for $2,500 for Dr. Patterson, which she said was going to pay for the Berlin street house. She told Will and Pearl that the Doctor had said he guessed he would have to let it go because he could not make the payment on it and that he paid too much for it and that he did not know anything about real estate and she felt sorry for the Doctor. She said the Doctor had also told her that many people did not pay their bills and she gave it as her own opinion that doctors did not get half enough pay for what they did anyway. Dr. Patterson took Mary from her home to the office of the register of deeds in the fall of 1942 and she then satisfied the $4,000 mortgage of record. There is no evidence of any payment to Mary as consideration for this transaction.

Dr. Patterson built a hangar in the early part of May, 1940, at a cost of $1,160, in which to store his airplane. He received $1,100 from Mary to pay on the cost of this hangar. This transaction was not evidenced by any writing. Dr. Patterson testified that he had an oral agreement with Mary

that in consideration of the $1,100 he would take care of her medically for the rest of her life and that he had carried out this agreement.

In May, 1941, Dr. Patterson bought another airplane and Mary advanced him $2,500 to pay the balance due on that. There was no note or other writing to evidence this transaction. On Mothers' Day, May 11, 1941, Dr. Patterson took Mary for two airplane rides in the new airplane, at which time she was a patient in the hospital. He sent her a bouquet of flowers also. Pearl Jensen called on her that same afternoon and brought some flowers to Mary and Mary told Pearl that she had to leave soon with the doctor to see his airplane. She was then in bed. Pearl left and came back later with some ice cream for her supper and brought Pearl's mother and father along and some other friends but Mary was not there and the next day she told Pearl she had been up in the airplane twice.

In the late summer of 1941, Dr. Patterson took Mary on an automobile trip to Yellowstone park. Mrs. Patterson and the four-year-old son of the Pattersons accompanied them. The expenses of the trip were paid by Mary.

Will Jensen had received an old automobile belonging to George Faulks for probating his estate. In 1941, Mary proposed that he get a new car and she advanced him $1,000 upon the price of a new car, the balance to be paid by the Jensens. Pearl testified that a little later Mary told her that when she informed Dr. Patterson that Will and Pearl were right down after the money for the car, Dr. Patterson said: "They were afraid you would turn your toes up before they got it."

Down to this point there is little if any dispute in the evidence. On Saturday, January 10, 1942, Mary was in the hospital owned by Dr. Patterson and his partner. On the next day, Sunday, January 11th, Will and Pearl called upon Mary. As to what happened on the 11th and succeeding days, there is considerable dispute in the evidence. Upon the trial Pearl testified that she and Will saw Mary in the hospital

shortly after Christmas,—she thinks around the 10th or 12th of January, 1942. At that time she said Mrs. Faulks told her that the Doctor had said that they did not hardly speak to him and that Mary said to them: "You have got to be nice to the Doctor," to which Will replied: "All he is after is your money." Pearl testified that she went to see Mary the next day and the first thing Mary said was "I am sorry the way Will feels about the Doctor." "I said, 'I don't blame him any,' and she said, 'I haven't given the Doctor any money,' and I said, 'You told us yourself that you gave him $2,500 to pay for that Berlin street house.'"

On cross-examination Pearl somewhat amplified her interview had at the hospital. After Pearl had told Mary that she herself had said she had given the Doctor $2,500, Mary replied: "Nobody knew that."

"I said why are you doing business that you are ashamed of? Sure she got angry. When we left she was not angry."

Pearl further testified that she never again visited Mary because the next day Mary told Will to get out and stay out. Mary's request to the Jensens under the circumstances does not seem unreasonable, although it discloses partiality on the part of Mary toward Dr. Patterson. There is nothing to indicate that Mary expected to bring on a quarrel. It apparently brought into the open the feeling of the Jensens against Dr. Patterson.

It appears that on January 21, 1942, the testatrix wrote a letter to one of the legatees, Arnold Larsen, and inasmuch as the trial court based his determination in part upon this letter, it, with relevant parts of three other letters, is set out in full in the margin.[1]

---

[1] Waupaca, Wis.                                    Jan. 21—42
Dear Arnold: Well here I am in the hospital again came a week ago Saturday P. M. had a lot of bad spells Saturday P. M. couldnt breath but got better after coming up here untill Pearl and Will came up Sunday and such a tong lashing as Dr. Patterson and I got they are so mad to think the Dr. and myself are such good friends they are

Will Jensen was recalled by the contestant and testified that he had always treated Dr. Patterson courteously. He further testified that he was there on Tuesday, January 13, 1942, the

afraid I might give him something and Will says he is sorry he stayed with us as now he has nothing and Pearl says if he had went in a garage to work they would have been better off they don't think that good farm is anything and beside the farm I gave them my share of stock and farm implements and paid the taxes and all repair bills and all I received from the farm was a little butter and a few eggs and beside that I always gave them $150 every Xmas. Paid the hired man gave them quite a lot of money every year $300 or $400 each year gave them two Studebaker cars am paying for Lorraine at the Wis. University. Dr. Patterson never asked that I should give him anything but he said he would have to get some money some place to pay for his hangar so I told him I would let him have it and he could give me medical care the rest of my life he agreed I was feeling real good at the time he has given me the best of care since. Will and Pearl may be sorry some day for the mean things they said about the Dr. as their isnt a more honest conscious young man anywhere except Arnold Larsen. You keep this and if anything should happen after I am gone you show this. We have had some real cold weather but these last days it has been about like early April thawe a lot every day.

How are you and all the rest of the family. I am going to write to your mother soon.

Love to you and the family.

Write soon.                                    MARY FAULKS.

On January 22, 1942, the testatrix wrote Gusta. Among other things in that letter she said:

Then Will and Pearl have been terrible to me and slandering the Dr. Pearl came in Friday she began wanting to know what I was doing with my money as if that was any of her business said if I had any to throw or give away better give it to them as they had to work so hard and only got enough to live on from day to day and Will called the Dr. some bad names they are so afraid they wont get all I have and now ashuradly they wont you remember how she acted about that Yellowstone trip so mad because I spent that money on myself.

On January 29, 1942, she again wrote Arnold Larsen. After stating that she had returned home from the hospital and some other matters immaterial here, she said:

I havent seen or heard a word from Will or Pearl guess they are just as mad at me as at the Dr. I surely hope they are enjoying their spell of temper hope it makes them satisfyed with themselves.

She wrote Arnold Larsen again on June 7, 1942. Among other things she said:

Will never calls or comes to see me I cant see what he became so mad at me for, but thank goodness I know just how much he thinks of me, just dollars.

day before the last will was executed. He said that she mentioned she was awfully sorry the way "I" felt about the Doctor.

"I said I could not feel any different for someone that would take money from an old lady that way. I had heard quite a few people talk about her giving him money. It had become quite a subject of conversation in the community at that time. She told me if that is the way I felt I better leave the hospital because he was there then and she did not want me to talk to him. I did not have any more visits then. I said good-bye and I went."

Will also denied that he made any statement to Mrs. Faulks that he thought the farm was not worth anything. He testified that he thought it was a wonderful farm, a good farm, and that he liked it.

Pearl Jensen recalled, testified as follows:

On Monday the first time I got in there she started right in again about the Doctor, feeling sorry about the way Will felt about the Doctor. I said I did not blame him any. I said he did not approve of anybody taking money that way from an old woman. She said, "I haven't given the Doctor anything." I said, "It was funny, you just told us yourself you gave him twenty-five hundred dollars to pay for the Berlin street house, and you also told us you did give him money before that" and then she said, "nobody knows that except Will." I asked her, "Has Will ever harmed you in any way," and she said, "No, he hasn't," and she said, "I have done all I can for him." I did not ask her any questions about it. Then I also said, "We know Grandpa Faulks would not approve of that way of doing business." I did say that. I did not mention that before. . . . As far as I know the visit was friendly. She acted all right when I left.

Pearl further testified that she was there on Friday, January 16th. She testified:

I read several letters to her from them in the hospital. There was not much talk. She acted kind of niff and did not

act friendly to me and I read the letter to her and asked her how she was and stayed a few minutes and left.

Pearl amplified her testimony to the effect that the testatrix told Will to get out and stay out. Her version of that incident differs from that of Will. He says Mrs. Faulks told him she did not want him there while the Doctor was there. She further testified:

I did not go to the funeral. My husband did not go to the funeral. I heard from outsiders about it, but not from the family.

Ida May Johnson, a witness for the proponent, was a nurse working in the Patterson Hospital, in January, 1942, at the time Mrs. Faulks was visited by Will and Pearl Jensen. Miss Johnson testified that Mrs. Faulks told her that she was leaving the Jensens out of her will; that the conversation which had just taken place was the cause of her changing her will. She said that at the time of the visit of Pearl to Mrs. Faulks she overheard a conversation between Mrs. Faulks and Mrs. Jensen; that there was an argument about the trip to Yellowstone with Dr. Patterson and family and about taking him out to dinner. Mrs. Jensen said she did not think she ought to spend her money that way. Her voice Miss Johnson thought was loud and very abusive. She testified:

I received complaints from other patients there in the hospital. Different patients called me to see what the loud talk was about. . . . There were a lot of things said, but I could not say, but I do remember about the trip to Yellowstone park.

She further testified that Mrs. Jensen told Mrs. Faulks that she did not think she ought to spend her money on trips with Dr. Patterson like that and taking him out to dinner. She heard Mrs. Faulks say to Mrs. Jensen that she thought she was capable of handling her own money.

There is no dispute about the fact that Mrs. Faulks during the last ten or eleven years of her life was in poor health. She suffered from myocarditis, a disease which affects the muscles of the heart and which is progressive. There is no evidence that it affects the mentality of a patient. In the course of the trial much was made of the fact that Dr. Patterson took Mrs. Faulks on the airplane trips allowing her to take the risk of excitement and high altitude at a time when she was afflicted with a serious heart trouble. He testified that these trips were taken at her insistent request and against his advice; that he fully explained to her the risk she ran. There is no evidence that they had anything to do with the execution or contents of the will.

Outside of the evidence given by Dr. Patterson, the only medical evidence given in the case was by Dr. C. W. Andrews. He said that in his opinion, taking Mrs. Faulks up for an airplane flight would increase the risk; that the risk of an airplane ride would be greater than riding in an automobile because of the excitement and changes in blood pressure, the thrill, and the lack of certain co-ordination.

Two of the three flights were taken after the execution of the will of January 14, 1942, the last one in the autumn of 1942. This testimony has very little,if any bearing upon the question of Mrs. Faulks' mental condition except to indicate that she was bound to have her own way.

A condensation of the testimony in regard to the mental condition of Mrs. Faulks was as follows:

Philip Teisberg, one of the witnesses to the January, 1942, will, testified:

There was nothing particularly in the appearance of Mrs. Faulks different from what I had already seen of her. She seemed bright.

Roy Barber, the other witness to the January, 1942, will, testified:

In the conversation with her I did not notice any difference in her mentality and condition from what I had already seen. She appeared just the same as always.

Pearl Jensen testified:

I could see a change coming over Mary Faulks during the last couple of years of her life. She always like to have you sit down and visit with her and talk about things on the farm, talk about politics and the war or anything of that kind, and she was a very saving woman, and after she went to the hospital in 1940 she started feeling sorry for the Doctor and was giving him money. Her conversation was always about the Doctor and it gradually grew more and more that way. She expressed feeling of sympathy and sorrow for him. She always said, "I feel so sorry for the Doctor." . . . Mary physically was very poorly at that time. We had to hang onto her walking down the street. She could just barely walk along. . . . In the last year or two she changed with respect to not wanting to be crossed or disputed or argued with. She told me herself one day that she guessed she got mad awfully easy. If anyone crossed her or did not do what she wanted she would become angry right away and they would be taken off her will. I know of the instance of Anna Faulks. She said Anna was telling about this Mrs. Nickel here in town. She figured she broke her hip and she went to Patterson's hospital and had it set and she did not get so she could walk, and her daughter, living out west, had her come out there and took her to a specialist, and he said the leg had not been set right and she would not be able to walk. Anna happened to tell this to Mrs. Faulks and she became angry right away and told Anna to get out and stay out. She told me that that night when I came after Lorraine. She said she was going to take her off from the will.

Myrtle Button, an old neighbor, who visited frequently with Mrs. Faulks, testified:

I noticed a change in her the last two years, 1941 and 1942. She wasn't like she was when she was out west. We started

a subject and then she would stop it and talk about Dr. Patterson. That was every time I went there. She did not carry on a conversation on the same subject very long. It would always turn to the Doctor. She was always telling how nice he was, how wonderful a doctor she had. There would not be nothing much to it, but that is all. . . . Her manner was different when she referred to him than when she talked about other subjects. She was kind of happy and smiled. The last time I was there she sat on the studio couch and she sat there with her hands folded and sat there and looked at the sky and just beamed about the Doctor. She was smiling all the time she talked about him. I could not get any sense out of it.

On cross-examination, she testified:

She did not tell me about the trouble she had with the Jensens that I recall. . . . She did not say anything about the Doctor's wife but she said the Doctor was very good to her, very kind to her. I suppose she meant that the Doctor had been a great comfort to her in her sickness. I don't know. She did not word it that way. She did not tell me the Jensens had not visited her since January. I wasn't concerned about that.

Martha Anderson, who was employed as a housekeeper by Mrs. Faulks, testified:

She did not refer to the Doctor in talking to me as son. She felt sorry for him. She said she guessed he was the son she never had. She requested him to come and see her every day. She said she wanted him to come every day but not to put himself out if he was busy. At one time she made the remark to me, "I don't know why I've taken such a liking to Dr. Patterson." . . . She mentioned to me that she wished she had more money than she did have. She said to try and help Dr. Patterson build a hospital for the city. She said she would like to live another year at least to see Dr. Patterson become famous. She said sure he would, that he was a very successful doctor and physician. In connection with the Appleton trip she got real sober when he could come right away and she said, "I wonder if I do right by giving out my money."

On cross-examination, she testified:

To sum up all of the relations that I had with her and my employment it amounted to this, that she thought a very great deal of Dr. Patterson.

Alice Faulks, the wife of Rufus Faulks, a deceased brother of George Faulks, testified that during the last four years she had visited Mrs. Faulks about four times a year. Previous to that she had visited her very frequently.

When the war started she kept informed on that. She was awfully down on Roosevelt. The last two years I could not visit with her. She wasn't interested in anything I was doing and she had only one subject anyway. It was her sickness. Her sickness and Dr. Patterson was the subject always. That and her sickness is all she would talk about. She referred to him as Dear Pat, Dear Doctor. When she spoke about him she always seemed to be very happy. She seemed to think that he was such a wonderful doctor. . . . She used to tell me how good he was. He would come up there every night when he was so tired. He would come to the house to see how she was and she always felt so sorry for him because he was overworked. She said one night she did not feel very well and he said, "Well, you get your things on," and she said, "I just told him I did not want to go to the hospital," and she said he was there in a few minutes. The way she spoke it was as though he picked her up and carried her out, and she said in a few minutes she was in the hospital and in bed. I said, "I am glad somebody takes care of you, because I can't."

On cross-examination, she said:

I perhaps saw her six times at least since January, 1942. She did not talk about the trouble she had with the Jensens.

On redirect examination, she testified:

There was nothing more I wanted to say in regard to her being a determined person, only if there was anything for her own pleasure she always seemed—she knew what she

wanted in a way, but the last two years she seemed so much different.

Emma Oleson, a neighbor, who had known Mary Faulks for many years, testified:

We usually met every two or three weeks or something like that. Up until she was quite feeble and wasn't able to. She stopped coming to the meetings when she became feeble. That was about five or six years ago. I visited at her home frequently. . . . I visited at her home during the last year or two of her life. I did not think she acted just like herself the last two or three years. Up to that time I thought she was very nice. I always liked her as an old friend. I don't recall in talking about various subjects that I noticed whether she would keep up with current events the last two or three years. She kept up with current events up to two or three years ago. She had a radio and spent time with that. She talked with me about things she heard over the radio. The last couple of years she did not do this as she had before. I don't think she was well. The last couple of years I visited her it wasn't much only Dr. Patterson. She liked Dr. Patterson very much. That seemed to be her main subject of conversation it seemed every time we went over her threshold.

Anna Faulks, a cousin of George Faulks, who had known George and Mary since she was a small girl, testified:

That friendship continued all the time that George was living and after George's death with Mary until October, 1941. I was visiting with her on January 8, 1941, in her home. . . . During that conversation the subject came up regarding a patient that Dr. Patterson had had. It was an old neighbor of ours, Mrs. Nickel. I said something to Mary respecting the condition of this patient. I said her hip had only partly knitted and she wasn't well. She had gone to her daughter in Seattle, Washington. She had been a patient of Dr. Patterson. I was just telling her what I had learned. When the visit ended she told me to get out of the house and stay out. I learned after that that there had been a will by Mary cutting me off entirely. . . . I did not see Mary Faulks after Septem-

ber 8, 1942. Then I did not think she was just like she used to be, I did not see her from October, 1937, until September, 1942. January 8th I saw her last. In 1942 I noticed a change. She did not seem to me like she used to be. She did not seem to talk about much. If we talked about anything she spoke about her illness and her Doctor and she told me she liked him. Her manner in talking as to expression, seriousness or happiness or sadness, was sort of joking way about her boy friends in September after Charlie's death. She did not mention the name. She said "I have a couple of boy friends." . . . Up to the 8th day of January, 1941, I never had any trouble like I have testified.

On cross-examination, she testified:

I think she was a person of quite determined character. I expect when she was crossed by anybody she resented it. She was always that way as long as I knew her. She was a well-informed and well-read person when she had her eyesight. She had a radio up to the last of her life that she listened to. She was a person who knew what she wanted and did what she wanted.

On redirect examination, she said:

I believe she retained those characteristics in September, 1942.

Wendell McHenry, the attorney who prepared the January, 1942, will and had no interest in the controversy, testified:

I talked with her approximately an hour and a half, I would say, not only about this, but other things. This was the only time I had even seen her. . . . Any opinion that I have regarding her mental capacity I gathered there that day, not only regarding the contents of the will, but otherwise in my conversation with her. I might say, as I stated before, I not only talked to her about the contents of her will, but I also visited for quite a period of time and we talked about world conditions, the war, and we talked about the trip she had

taken to Yellowstone park, and I told her of things I had seen there, and she told me of things she had seen there. We talked quite lengthy in general, and it was my opinion she was one of the most intelligent elderly women I ever met and a very interesting conversationalist, very well versed on every subject I discussed with her.

Dr. Patterson and Dr. Bowdry were the owners of the Waupaca Hospital and Clinic. Mary Faulks was a patient in that hospital between May 1, 1940, and December 26, 1942,— two hundred forty-nine days. In May, 1940, Dr. Patterson made a contract with her to take care of her medically on account of the $1,100 loaned to him. In September, 1940, Dr. Patterson took Mary Faulks to Oshkosh where she underwent an operation by a specialist. He paid $150 for that operation under his contract.

Dr. Patterson lived within three blocks of Mary Faulks' home and the Doctor's wife and Mary Faulks visited back and forth. The Doctor testified that Mrs. Faulks insisted on taking the airplane rides and the trip to Yellowstone park against his advice and after he had fully explained to her the risks which she ran in making these trips. He testified that she showed no bad effects from the airplane rides and Dr. C. W. Andrews, the only other expert medical witness called upon the trial, testified:

I would say that riding in the airplane would be attendant with more risk than riding in an automobile because of the excitement and blood changes in the pressure, the thrill and lack of certain co-ordination. . . . The first ride in an airplane would be more thrilling and exciting than those following. After the first ride up, if it did not result in any undue excitement, it was a pretty good test of the individual. Something that would depend on the height at which you flew. . . . Assuming a person seventy-seven years of age, and suffering from a severe case of myocarditis, and growing older, and that becoming more acute, the greater the altitude the greater would be the danger.

While there is testimony from the witnesses that they noticed changes in Mary Faulks during the last two years of her life, they all agreed that she was a woman of determined character, resented being crossed, and that she had always been that way. There is no evidence from which an inference can legitimately be drawn that Mary Faulks did not retain her full mental faculties, down to the time of executing the January, 1942, will, and very little that indicated she was impaired mentally at the time of her death in December, 1942.

Upon all the evidence, only a part of which has been set out, the court found:

(1) That on January 14, 1942, and for several months prior to said date Mary Faulks was a person unquestionably susceptible to undue influence.

(2) That during all that time L. G. Patterson, who is named as the principal beneficiary in the instrument propounded by him had opportunity to exercise such influence and to induce her to make a will in his favor.

(3) That L. G. Patterson, the proponent of said will, was disposed to influence her unduly for the purpose of procuring improper favors.

(4) That the execution of said will clearly appears to be the effect of undue influence exercised by L. G. Patterson over Mary Faulks.

The court then found that the instrument propounded by Will Jensen, and executed by Mary Faulks in January, 1941, was her last will and testament, and that at the time of signing it she was over twenty-one years of age, was mentally competent to execute a will, and was not subject to duress or undue influence.

At the time of the execution of that will, it appears from the evidence that Dr. Patterson had in addition to the $1,100 which he says was for the medical care of Mrs. Faulks, received $8,600. The making of this bequest to Dr. Patterson was not the result of undue influence according to the finding of the trial court.

The will of January 14, 1942, was drawn by a reputable, disinterested lawyer and witnessed by two witnesses who were brought to the hospital for that purpose at the request of Mrs. Faulks. There is no evidence that Dr. Patterson ever did anything about the drafting and execution of the will or made any suggestions whatever in regard to it.

The trial court in its opinion said:

"Several letters written by the deceased to persons named as beneficiaries in her wills were admitted in evidence against the objections of the attorneys for the contestants. They were admitted on the theory that they were competent as proof of her mental condition. One of these, (EB) was written with the intent that it should be used after her death as an explanation of her reasons for altering her plans for the disposition of her property. She knew, or should have known, that if any contest should arise regarding her will all the material facts would then become known. It is therefore reasonably certain that in this letter she stated as truthfully and as fully as she was able her recollection of certain matters which she considered material. It is apparent from this letter that she was ignorant of the fact that her foster-son Will Jensen had continued to pay her rent for the farm occupied by him for four years after the death of her husband. She could not recall that she had discontinued her usual practice of making Christmas gifts to Will and Pearl and Lorraine Jensen previous to the alleged quarrel. As to her gifts to Dr. Patterson, she recalled only that she had given him money ($1,100) to pay for his hangar and that she was receiving his services in return therefor; and she was not then aware of the fact that she had also given him over eleven thousand dollars at other times."

The letter to which the trial court referred is that of January 21, 1942. It is considered that the trial court did not fairly interpret this letter. There was no attempt on her part and no reason for her to state everything that she knew in regard to this matter. As a matter of fact, she had always made Christmas presents to the Jensens up to the time of the

quarrel with them about her gifts to Dr. Patterson. She had advanced money to them, she had paid part of Lorraine's expenses at the University of Wisconsin but after the quarrel she paid no more on this account. During the last four years Will paid no rent and she received nothing but produce from the farm. She did not attempt to describe all of the financial transactions she had with Dr. Patterson but referred to the one relating to her medical care. If these letters tend to show anything they tend to show that the testatrix was in full possession of her mental faculties, was perfectly well aware of what she was doing, and in her opinion had good reasons for doing it. There can be little doubt that there was a great deal more to the conversation between her and Pearl and Will Jensen in 1942 than they are willing to admit. The fact that they never visited her after January, never called her on the telephone, and stayed away from her funeral, indicates a very deep feeling on their part. It appears from the letters that Mrs. Faulks deeply resented their interference with the disposition of her property. Many expectant heirs have made the mistake of attempting to assume control of a testator's affairs before his death with like consequences.

The appeal in this case is from the entire judgment—that which denied the probate of the will propounded by Dr. Patterson and that part which admitted to probate the will propounded by Will Jensen. We have carefully examined the evidence in this case and we find no grounds upon which it can be said that the will of January 14, 1942, was the result of undue influence or anything in regard to the disposition of Dr. Patterson to influence the making of the will or anything in regard to the susceptibility of Mrs. Faulks in January, 1942, that does not apply equally to the will of 1941. Under the will of 1941, Dr. Patterson would have been a beneficiary at the time of the execution of the 1942 will in the sum of approximately $13,500. If the legacy to Dr. Patterson is a sufficient basis for the conclusion that the will of 1942 was the result of undue influence exerted by Dr. Patterson, the pro-

visions for Dr. Patterson in the will of January, 1941, are a basis for the conclusion that it was also the product of undue influence. While Dr. Patterson was given a greater amount by the will of January, 1942, there is nothing in the evidence which tends to show that he did anything more than continue to do what he had done prior to January, 1941. As a matter of fact, if there is taken out of this case the provision of the will for Dr. Patterson, there is no evidence which tends to show undue influence. The entire case here rests upon the fact that she gave the greater part of her fortune to her physician, thus disinheriting the Jensens, Anna Faulks, and Eliza Palmer, legatees in former wills.

As already stated, the court found that the will of January, 1941, was executed by Mary Faulks in the presence of witnesses, and that at the time of execution she was over twenty-one years of age, mentally competent to execute a will, and was not subject to duress or influence. These findings appear to us to be sustained by the evidence. While she was seventy-eight years of age at the time of her death, she apparently had full control of all her bodily functions and her mental faculties. Her only ailment was trouble with her heart but there is no evidence that it affected her mental condition.

It is considered that the determination of the questions raised in this case rest mainly upon two propositions of law:

(1) Under the facts, where is the burden of proof in this case? and (2) what is the effect of the confidential relationship existing between the testatrix and Dr. Patterson, the principal beneficiary?

(1) In this state undue influence is regarded as a species of fraud. In *Will of Slinger* (1888), 72 Wis. 22, 27, 37 N. W. 236, speaking of undue influence, it was said:

"Manifestly, it is a subtle species of fraud, whereby mastery is obtained over the mind of the victim by insidious ap-

proaches, seductive artifices, or other species of circumvention."

In *Will of Schaefer* (1932), 207 Wis. 404, 411, 241 N. W. 382, it is said:

"In this state undue influence is considered as a species of fraud and must be established by clear, convincing, and satisfactory evidence." See also *Will of Boardman* (1922), 178 Wis. 517, 190 N. W. 355; *Will of Emerson* (1924), 183 Wis. 437, 198 N. W. 441; *Will of Grosse* (1932), 208 Wis. 473, 243 N. W. 465.

Since *Ball v. Boston* (1913), 153 Wis. 27, 141 N. W. 8, it is the established rule in this state that in will cases fraud or undue influence must be established by clear, convincing, and satisfactory evidence which means something more than a mere preponderance of evidence. *Ball v. Boston, supra,* was a carefully considered case. One justice questioned the soundness of the rule and two justices dissented from the conclusion reached by the court. However, the rule announced in that case has since been followed. See *Will of Grosse* (1932), 208 Wis. 473, 243 N. W. 465; *Estate of Scherrer* (1943), 242 Wis. 211, 7 N. W. (2d) 848.

The same cases hold that the burden of establishing undue influence is upon the contestant. The reason for the rule is fully stated in *Ball v. Boston, supra*. See also *Will of Schacht* (1921), 175 Wis. 54, 182 N. W. 981.

In *Davis v. Dean* (1886), 66 Wis. 100, 26 N. W. 737, the question was whether a deed had been procured by undue influence. It was there held that where an aged and infirm woman, a few days before her death which resulted from a painful accident, and while in a prostrated and precarious condition, conveyed the bulk of her property to a young man who stood in the relation of an adopted son to her, who had married her granddaughter, and in whom she trusted, thus disinheriting her daughter and grandchildren with whom her relations

were friendly, and where the circumstances suggest an effort on the part of the grantee to keep those most interested in ignorance of the fact that she was about to convey her property to him, the burden of proof is upon the grantee to show absence of fraud and undue influence.

This case has been criticized, explained, distinguished, modified, and followed in a number of cases. There is considerable confusion in the cases due to various interpretations placed upon it. The confusion is due principally to the fact that the court has not always observed the distinction which exists in the use of the term "burden of proof." It is used in two senses: (1) The risk of nonpersuasion of the jury. When used in that sense, the burden of proof never shifts. 9 Wigmore, Evidence (3d ed.), p. 286, sec. 2489. (2) It is used to describe the duty of producing evidence to satisfy the trier of fact. When used in that sense, the burden is sometimes said to shift. Mr. Wigmore says:

"Moreover, in a distinctive sense, this kind of burden 'shifts' and the other does not, in that during the unchanged prevalence of the first kind of burden for one party, the second kind may be shared in turn by one and the other, though the first—the risk of nonpersuasion of the jury, should the case be left in their hands—has not come to an end." See also 1 Page, Wills (2d ed.), p. 1107, sec. 670.

In *Ball v. Boston, supra,* at page 37, it was said:

"In the end, upon the whole case, the circumstances from which the alleged undue influence is inferable as matter of law must stand upon such evidence. That is, the burden being upon the one charging undue influence, from first to last, to establish it by clear and satisfactory evidence, the rule goes to the existence of the circumstances; the effect of the circumstances is matter of law.

"Weaken the case as to any one of the vital major incidents so that it can no longer be said to exist by clear and satisfactory evidence; then the *prima facie* case once created is so far re-

butted that the plaintiff [contestant] cannot successfully stand thereon, but must go further."

This is well illustrated in *Loennecker's Will* (1901), 112 Wis. 461, 467, 88 N. W. 215, which was a case of undue influence in making of a will, in which the distinction was observed. The court said:

"The conclusion which is practically reached in *Fox v. Martin, supra* [104 Wis. 581, 80 N. W. 921], with reference to wills is, in brief, that in order to raise the presumption of undue influence, which throws the burden of proof on the beneficiary, there must be shown a subject unquestionably susceptible to undue influence, either as the result of old age, mental weakness, or both; also some clear evidence of opportunity, and a disposition on the part of the beneficiary, to exercise such influence. When these facts are shown to exist, and especially when they exist with other facts out of the usual course of business transactions of such a nature, *the presumption will arise which will put the beneficiary to his proof of good faith and freedom from undue influence.* Whether the testimony shows these preliminary facts with sufficient clearness and certainty is a matter to be decided by the trial court.
"In the present case it is enough to say that the requisite facts to raise the presumption were not shown."

For further examples in which the distinction was sometimes observed and sometimes not, see note: Presumption of undue influence, 21 Am. St. Rep. 94.

In *Winn v. Itzel* (1905), 125 Wis. 19, 31, 103 N. W. 220, the case of *Davis v. Dean, supra*, and *Vance v. Davis* (1903), 118 Wis. 548, 95 N. W. 939, are commented upon. In that case it was assumed that when the presumption arose, the burden rested upon the defendant who was required at that point to put in her testimony. The court said (p. 31):

"This practice seems somewhat singular, and apparently indicates some confusion of ideas on the part of both court

and counsel as to the effect of the doctrine laid down in the *Davis v. Dean Case*, and approved with some modifications and explanations by subsequent cases. [Citing cases.] . . . *After as well as before that decision, in case the trial court held that a prima facie showing of fraud had been made, the defendant could either stand upon the plaintiff's proofs and challenge their sufficiency in this court, or he could introduce his own proofs tending to rebut the plaintiff's case and establish his innocence. In this sense, and in this sense only, the burden of proof shifts."*

The decision in the case of *Winn v. Itzel, supra,* is in complete harmony with the rule as laid down by Wigmore. The distinction has not always been observed. *Winn v. Itzel* will be referred to hereinafter.

In view of the confusion which over the years has grown out of the pronouncement of the court in the case of *Davis v. Dean, supra,* it will be helpful to review the subsequent cases dealing with that case.

The first case in which it was cited was *Leach v. Leach* (1886), 65 Wis. 284, 26 N. W. 754. While *Leach v. Leach* was decided after *Davis v. Dean, supra,* it was reported in 65 Wis. This case dealt with the duty of a trustee to the *cestui que trust.* In that relationship a rule of substantive law applies. Restatement, 1 Trusts, p. 431, sec. 170.

It was next considered in the case of *Will of Slinger, supra,* at page 34. In that case it was said:

"It is well settled that where the party to be benefited by the will has a controlling influence or agency, or is particularly active in procuring the execution of the will, it is universally regarded as a very suspicious circumstance, requiring the fullest explanation. [Citing cases.] Especially is this so where such active agent occupies a confidential relation to such testator; as in the case of attorney and client, physician and patient, priest and parishioner, or other relationship calculated to inspire confidence and trust in such testator.

In *Parry v. Parry* (1891), 80 Wis. 122, 48 N. W. 654, *Davis v. Dean, supra,* was cited in a controversy relating to the duty of trustees.

In *McMaster v. Scriven* (1893), 85 Wis. 162, 172, 55 N. W. 149, the question was whether a will had been procured by undue influence. The court said:

"In this case it is contended that Scriven and his wife had the opportunity to exercise undue influence over the testatrix; that they had the temptation to exercise it; and because of the liberal provisions in the will in their favor it is to be presumed that it was the result of such influence acting on the mind of the testatrix, and this presumption must prevail unless rebutted. It may be conceded that there are circumstances in this case which beget suspicion, but the judgment of the court cannot go upon mere suspicion. The special circumstances in *Davis v. Dean*, 66 Wis. 108, 110, and *Will of Slinger*, 72 Wis. 27–33, clearly distinguish those cases from the present, and, like the case of *Tyler v. Gardiner*, 35 N. Y. 559, show under what circumstances the burden of proof will be placed on the claimant under the will to show that the will was not the result of undue influence. . . .

"The facts shown by the contestant did not, in our judgment, change the burden of proof on the subject of undue influence, or establish it by a preponderance of evidence against that produced by the proponent." Here "burden of proof" is used in the second sense.

*Creamer v. Ingalls* (1894), 89 Wis. 112, 61 N. W. 82, deals with a trust relationship.

In *Cole v. Getzinger* (1897), 96 Wis. 559, 71 N. W. 75, an action to set aside a conveyance on the ground of undue influence, *Davis v. Dean, supra,* was quoted at length, and it was held that presumption of fraud and undue influence was not rebutted but strengthened by the evidence offered by the defendant.

In *Doyle v. Welch* (1898), 100 Wis. 24, 75 N. W. 400, it was held that the evidence was not sufficient to overcome the presumption of undue influence and fraud.

*Disch v. Timm* (1898), 101 Wis. 179, 191, 77 N. W. 196, was an action to set aside a deed on the grounds of undue influence and fraud. In this case it was held that the facts proven raised a presumption that the deed was obtained by fraud or undue influence, and that in the absence of evidence on the part of the defendants to overcome such presumption the deed should be set aside. The court said:

"In *Davis v. Dean,* 66 Wis. 100, an old lady, in feeble health, and suffering pain from disease, without consideration, conveyed, to one of her heirs at law, land of the value of four or five thousand dollars, secretly and without the knowledge of the other heirs at law, who were near and might readily have been called in. The trial court sustained the conveyance, but the judgment was reversed by this court, on the ground that the evidence raised a presumption that the deed was obtained by fraud or undue influence, and that the burden of removing such presumption was upon the defendants claiming under the deed." Here "burden of proof" is also used in the second sense.

When some evidence to the contrary is received, that is, evidence which if uncontradicted is sufficient to support a finding, the presumption is destroyed or removed—it then has no probative force. The matter is then to be determined upon all the facts freed from the presumption. *State ex rel. Northwestern Dev. Corp. v. Gehrz* (1939), 230 Wis. 412, 422, 283 N. W. 827. See 9 Wigmore, Evidence (3d ed.), p. 290, sec. 2491, 3, and cases cited; *New York Life Ins. Co. v. Gamer* (1938), 303 U. S. 161, 58 Sup. Ct. 500, 82 L. Ed. 726, see note 114 A. L. R. 1226.

*Small v. Champeny* (1899), 102 Wis. 61, 68, 78 N. W. 407, was also an action to set aside a deed on account of fraud or undue influence. *Davis v. Dean, supra,* was cited and the following comment made:

"In *Davis v. Dean,* this language was used: 'If the burden of proof is upon the plaintiffs to show such fraud or undue influence, probably we could not disturb the findings of the

circuit court which negative their existence. But *under the circumstances of this case the burden of proof is not upon the plaintiffs.'* The significance of the language, 'under the circumstances of this case,' is liable to be overlooked, as it undoubtedly was by the learned circuit judge. In connection with that part of the opinion in *Davis v. Dean,* just quoted, is a statement of the circumstances mentioned which it was said presumptively made the case for the plaintiffs and placed the defendant in the position indicated in the quoted language. In *Disch v. Timm,* the present chief justice, quoting with approval from a late New York case, said: 'When opportunity and a disposition to influence the act of another improperly are shown, a presumption of undue influence arises, and the burden of proof is *then on the party charged therewith to show that such other acted intelligently and voluntarily.'* To the same effect the court, by Mr. Justice WINSLOW, in *Doyle v. Welch,* said: *'When a voluntary conveyance is made by an aged person of his entire property without consideration, to one who stands in a position of trust and confidence to him, under circumstances of secrecy,* the burden of proof is upon the grantee to show that the conveyance was untainted with undue influence.' . . .

"A presumption against the person charged does not exist from the mere fact that there is such a charge, but because of circumstances appearing which satisfactorily suggest the wrong, and it is not till such circumstances appear that it can properly be said the burden of proof to disprove wrong is on the person charged. . . .

"If the circumstances are controverted, the jury should be told that they must find the facts in that regard from the evidence, the burden of proof to satisfy them by a preponderance of evidence being upon the party charged. The facts being uncontroverted, or found by the jury from the evidence, *prima facie* showing fraud or undue influence as a matter of law, the jury should be told to find against the party charged therewith unless satisfied from the whole evidence in the case that the act called in question was the free, voluntary, and deliberate act of the alleged defrauded party, the burden of proof being upon such party."

*Fox v. Martin* (1899), 104 Wis. 581, 80 N. W. 921, was a contested will case on the ground of undue influence. *Davis*

*v. Dean, supra,* was cited and quoted but not commented upon.

*Haynes v. Harriman* (1903), 117 Wis. 132, 92 N. W. 1100, was an action to set aside a conveyance on account of fraud and undue influence. *Davis v. Dean, supra,* was cited but was held to be so dissimilar in its facts that it was difficult to perceive why it was cited.

*Vance v. Davis, supra,* was an action to set aside a conveyance by a mother to a daughter on the ground of fraud and undue influence. Previous cases were commented upon, including *Davis v. Dean, supra,* and the circumstances which must be present in order to arouse a presumption were stated. It was then held that the facts and circumstances of the case distinguish it from such cases.

*Winn v. Itzel, supra,* was an action to set aside a deed for fraud and undue influence. It was held that the evidence did not sustain the finding of the trial court. The court said (p. 31):

"This practice [requiring the person charged to take up the burden of proof because it had shifted] seems somewhat singular, and apparently indicates some confusion of ideas on the part of both court and counsel as to the effect of the doctrine laid down in the *Davis v. Dean Case,* and approved with some modifications and explanations by subsequent cases. See *Small v. Champeny, supra; Vance v. Davis, supra.* We do not understand that the principle there approved changed the practice in fraud cases, or affected the order of the trial of such cases. Parties who charge fraud must prove fraud after as well as before that decision. They still have the burden of proof. It was simply held in that line of cases that when a plaintiff, charging fraud, had proven certain facts, he had made a *prima facie* case, though he might not have produced any direct evidence of fraudulent acts or words, and he might then rest his case, and the defendant must then rebut the inference of fraud so raised by affirmative proof of good faith. After as well as before that decision it was incumbent on the plaintiff to make his case in the first instance, and to present all the proof which he had and wished to present tending to prove fraud, whether circumstantial or direct.

After as well as before that decision it was the duty of the court at the close of the plaintiff's case to decide whether a *prima facie* showing of fraud had been made, if the question was raised by proper motion on the part of the defendant. After as well as before that decision, in case the trial court held that a *prima facie* showing of fraud had been made, the defendant could either stand upon the plaintiff's proofs and challenge their sufficiency in this court, or he could introduce his own proofs tending to rebut the plaintiff's case and establish his innocence. In this sense, and in this sense only, the burden of proof shifts. When the plaintiff makes a *prima facie* case, entitling him to relief if the proof stops there, the defendant must take up the burden and meet the case so made by other evidence. This is the case in all contests of fact. It is not peculiar to fraud cases. The rule of *Davis v. Dean* did not change the long-established rule nor did it tend to do so. It simply announced what facts would be considered as *prima facie* proof of fraud, requiring explanation by the defendant."

In this connection *Vance v. Davis* (1903), 118 Wis. 548, 95 N. W. 939, was cited as was *Loennecker's Will* (1901), 112 Wis. 461, 88 N. W. 215.

*Champeau v. Champeau* (1907), 132 Wis. 136, 112 N. W. 36, was an action to set aside a conveyance on the ground of fraud and undue influence. The court quoted from *Winn v. Itzel, supra.* What was said in this case about the application of *Davis v. Dean, supra,* has already been set out under *Winn v. Itzel.*

*Eisentraut v. Cornelius* (1908), 134 Wis. 532, 542, 115 N. W. 142, was an equitable action for the discovery of property. In its disposition of the case, the court said:

"It is urged, in view of the fiduciary relation of the defendants with decedents, that the trial court in effect imposed on defendants the burden of disproving the charge of undue influence under its interpretation of the decision of *Davis v. Dean,* 66 Wis. 100, 26 N. W. 737. The record does not disclose that this burden was so imposed on appellants. The

proper application of *Davis v. Dean, supra,* was considered and explained in *Winn v. Itzel,* 125 Wis. 19, 103 N. W. 220. We do not deem it necessary to elaborate the subject in view of the full discussion in this last case."

*Ball v. Boston* (1913), 153 Wis. 27, 36, 141 N. W. 8, was a contested will case, the ground of the contest being undue influence. In *Ball v. Boston,* previous cases are dealt with and the entire matter reconsidered. With respect to burden of proof, the court said:

"We note the statement in the learned circuit judge's opinion that, the contestants having established a *prima facie* case of undue influence, the burden was upon the proponent to show that the will was the testator's own voluntary act. That is somewhat ambiguous, in view of the expressions found in *Davis v. Dean,* 66 Wis. 100, 26 N. W. 737; *Disch v. Timm,* 101 Wis. 179, 77 N. W. 196, and some other cases, from which it might be inferred, perhaps not without warrant, that in this class of cases, the burden of proof is on the person charged with fraud to prove affirmatively that there was no such wrong upon a *prima facie* case being circumstantially made against him; that then the burden of proof shifts and remains with the defendant. Those expressions were somewhat emphasized by the statement in *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939 [quoting a part of the comment already set out under that case]. . . .

"All such expressions, understood with reference to the premises upon which they are based, and the particular facts dealt with, are free from serious, if not from any, infirmity, yet they have misled, sometimes, as the records here bear evidence.

"Whatever of misleading character there is in the expressions referred to, was intended to be eliminated from our jurisprudence in the treatment of the subject by the present chief justice, speaking for the court, in *Winn v. Itzel, supra* [quoting matter already set out under that case]. . . .

"Thus it will be seen, in a case of this sort, upon a *prima facie* case being circumstantially made calling upon the person charged with fraud to explain his conduct, there still stands the presumption against wrong doing, eclipsed for the time

being by the adversary presumption, but, subject to be efficiently aroused by affirmative evidence, direct or circumstantial, so satisfactorily explaining the adversary circumstances that they no longer seem to exist by clear and satisfactory evidence. In the end, upon the whole case, the circumstances from which the alleged undue influence is inferable as matter of law must stand upon such evidence. That is, the burden being upon the one charging undue influence, from first to last, to establish it by clear and satisfactory evidence, the rule goes to the existence of the circumstances; the effect· of the circumstances is matter of law. Weaken the case as to any one of the vital major incidents so that it can no longer be said to exist by clear and satisfactory evidence; then the *prima facie* case once created is so far rebutted that the plaintiff cannot successfully stand thereon, but must go further."

*Estate of Weaver* (1926), 191 Wis. 431, 211 N. W. 130, involved a will contest on the ground that the testator was subject to undue influence. There is a quotation from *Davis v. Dean, supra,* already set out and there is a statement of the limiting comment in *Ball v. Boston, supra,* which has already been set out *in haec verba.* In this case it was held that the finding of the trial court was contrary to the clear preponderance and great weight of the evidence.

In *Will of Bocker* (1918), 167 Wis. 100, 106, 166 N. W. 660, the court said:

"We feel that the logic·of the situation made it incumbent upon a proponent of a will, situated toward the maker of it as Selma was toward Mrs. Bocker, to meet and overcome the natural and irresistible presumption that arose from this unexplained change in the two documents, when there was such clear proof of the disposition to exercise undue influence, such abundant opportunity to exercise it, and where a so ardently desired result is so plainly manifest."

This amounts to no more than a holding that upon the whole evidence, it satisfactorily appears that the will was procured by undue influence and the judgment of the lower court

holding to the contrary was reversed. Burden of proof was here used in the second sense.

In *Will of Stanley* (1937), 226 Wis. 354, 276 N. W. 353, the proposition laid down in *Will of Bocker, supra,* is quoted and reference is made to *Will of Link* (1930), 202 Wis. 1, 231 N. W. 177. *Will of Link* did not deal with burden of proof but with the weight of the evidence. The evidence was held sufficient to sustain the charge of undue influence.

In *Will of Raasch* (1939), 230 Wis. 548, 556, 561, 284 N. W. 571, *Davis v. Dean, supra,* was cited to the following proposition:

"The trial court having found the opportunity and the disposition, and that Walter occupied a position of trust and confidence with the testator, the burden rested with the proponent to show that the will was not tainted with undue influence."

But the court went on to consider the case and to determine where the great weight and clear preponderance of the evidence lay, and said:

"We would have to so hold if the burden of proof rested upon the contestants, but it did not. When the contestants made their case and had established the relation of trust and confidence which Walter Raasch occupied with the testator, the burden of proof then shifted upon the proponent of the will. He has not met the burden cast upon him."

If this means that the proponent did not produce sufficient evidence to overcome the inference which could legitimately be drawn from that produced by the contestants, it is a correct statement of the law. If it means that the burden of proof as to undue influence shifted to the proponents, then it is out of line with previous cases in this state and should be and is overruled to that extent. But the almost universal holding is that the burden of proof in the sense that it means risk of non-persuasion of the trier of fact does not shift. The burden of

sustaining the charge of undue influence is on the one who makes it and remains there through the trial.

In *Will of Ehlke* (1943), 244 Wis. 115, 11 N. W. (2d) 497, *Davis v. Dean, supra,* was referred to and a statement quoted from *Estate of Weaver, supra,* was quoted with approval without considering the previous cases which limit and modify it. However, the correct rule as stated was applied for the case was reversed and the case remanded for a new trial in order that counsel might offer evidence to rebut the presumption created by the evidence offered by the contestant.

The case of *Boardman v. Lorentzen* (1914), 155 Wis. 566, 571, 145 N. W. 750, should have prevented any further mis-, application of the rule of *Davis v. Dean, supra.* The statements found in that case are so explicit and inclusive that we quote at length from it.

"Some light is thrown on the manner in which the result was reached by observing that the trial judge indulged in the idea, for which there is some basis in the early decisions here, but which the court of late has endeavored, time and again, to correct, that upon a *prima facie* showing being made in a case of this sort, there is a shifting of the burden of proof to the side of the defendant, requiring him, in order to prevail, to prove affirmatively to a reasonable certainty, that the transaction was the free, voluntary, intelligent act of the deceased. That is all wrong. This court has said so in *Small v. Champeny, supra, Vance v. Davis, supra, Winn v. Itzel, supra, Ball v. Boston, supra,* and other cases.

"It is unfortunate that trial courts now and then, cling, seemingly, to the idea of the shifting of the burden of proof in such cases, and in that way take a wrong view of the evidence. There is no more shifting of the burden of proof in this class of cases [action to set aside deed on ground of undue influence] than in any ordinary case where the plaintiff by evidence in chief succeeds in making out a *prima facie* case. The burden of proof rests with him from the beginning to the end. The only distinguishing characteristic of the particular class is this: The court has held that some circumstances are sufficient to so lift the burden as to call for rebuttal.

But all the defendant need then do is to produce sufficient evidence to so weaken plaintiff's case, that the circumstantial and other evidence in his behalf no longer establishes the fraud charged with the requisite clearness to warrant a decision in his favor. That is to say, a *prima facie* case, circumstantially made against the defendant, does not require him, in order to defeat it, to prove affirmatively that the act challenged was free from any fatal taint, as if he were the plaintiff holding the burden of proof and required to so establish facts. The charge against the defendant in such a case as this, in effect, accuses him of having perpetrated a fraud of a serious nature. There is a strong presumption in his favor against such wrong doing, which persists to the end of the litigation unless overcome by circumstances inconsistent therewith, established by clear and satisfactory evidence."

For later cases see *Tower Grove Bank & T. Co. v. Duing* (1940), 346 Mo. 896, 144 S. W. (2d) 69, 152 A. L. R. 1325, and note p. 1331.

We have considered the case of *Davis v. Dean, supra,* at much length for the reason that a failure to observe a modification made by the court of the doctrine laid down in *Davis v. Dean* in *Winn v. Itzel, supra,* has led to the misapplication of the rule of that case when applied to a different state of facts. It undoubtedly laid down a correct rule in that case for there was not sufficient evidence in the case to rebut the inference arising from the facts proven by the contestants and judgment went for the contestants on the whole case. It did not hold as an abstract proposition that the burden of proof shifted.

From the foregoing cases and others, the following propositions may be deduced: (1) The burden of proof is upon the proponent to establish by the fair preponderance and weight of the evidence that the instrument propounded is the genuine last will and testament of the deceased; that he was competent to make a will, and that it was duly executed and attested with the requisite formalities. This burden remains with the proponent to the end of the trial.

(2) Undue influence is a species of fraud and the burden is on the contestant to establish it by evidence that is clear, satisfactory, and convincing.

(3) When a contestant has produced evidence which, if believed by the court, will support a finding that execution of the will was induced by undue influence exerted upon the maker, the proponent may offer evidence to the contrary, or, he may stand upon the case as made and stake his success upon convincing the court that the evidence offered by the contestant is not to be believed or that the proper inferences to be drawn are not those asserted by the contestant. In other words, the contestant having made out a *prima facie* case (that is, one sufficient to support findings in his favor if his testimony is believed), it is for the proponent to proceed in one of the ways above indicated but the burden of proof on this issue does not shift to him.

(4) If the contestant fails to establish undue influence by the requisite degree of proof, his attack upon the will fails so far as this issue is concerned.

(5) It then becomes the duty of the court to admit the will to probate if upon the whole case the court finds that the proponent has sustained the burden of proof and satisfactorily established the elements heretofore mentioned in (1).

2. We shall next consider the effect upon the will of the fact that a confidential relationship existed between the testatrix and Dr. Patterson, the principal beneficiary. The relations of attorney and client, physician and patient, priest and parishioner, and some others are ordinarily referred to as being of a confidential and personal nature. The rules applicable to these relationships do not ordinarily extend to the relation of parent and child or husband and wife. It is generally held that the existence of confidential relations between the testator and the favored beneficiary, standing alone, do not necessarily constitute undue influence although it may cause the court to examine the case with greater scrutiny and

may, when coupled with other circumstances, raise a presumption of undue influence, but the question must be determined, as in all other cases, by ascertaining whether the free agency of the testator has been destroyed. 68 C. J. p. 751, sec. 442, and cases cited; 28 R. C. L. p. 146, sec. 100; 1 Page, Wills (2d ed.), p. 1230, sec. 720.

With respect to the burden of proof the general rule has been stated thus:

"While it has been held in a few jurisdictions that the existence of confidential relations between the testator and a beneficiary under his will creates a presumption of undue influence and casts the burden of showing freedom from restraint on the beneficiary, the rule obtaining in a majority of jurisdictions wherein the question has arisen is that a presumption of undue influence is not raised and the burden of proof is not shifted by the mere fact that a beneficiary occupies, as regards the testator, a confidential or fiduciary relation, such as that of attorney, physician, guardian, spiritual adviser, employer, landlord, or a close business relation, such as that of partner or confidential business manager. However, it is the general rule in practically all jurisdictions that undue influence is presumed and the burden of proof shifted so as to require the beneficiary to produce evidence which at least balances that of the contestant, when, in addition to the confidential relation, there exist suspicious circumstances, such as the fact that the beneficiary took part in the preparation or procuring of the will, or actually drafted it or assisted in its execution, or that the testator was weak-minded or in frail health and particularly susceptible to influence, or that the provisions of the will are unnatural and unjust. Before there can be room for application of any of these rules it is necessary that the relation between the parties be a fiduciary or confidential one, and that the person occupying such a relation toward the testator take a beneficial interest under the will." 68 C. J. p. 758, sec. 451.

We are unable to discover any Wisconsin case which deals with this precise question. *Armstrong v. Morrow* (1917), 166 Wis. 1, 8, 163 N. W. 179, was an action brought to set

aside a conveyance made by client to his attorney on the ground of undue influence. In that case the court found as to an assignment of mortgage made by the testator to his attorney that there was no valid consideration for such assignment; that the defendant had deeply ingratiated himself into the testator's confidence; that the assignment was prepared by the attorney and was procured by improper and undue influence. This court said:

"The established facts bring the case clearly within the doctrine repeatedly laid down by the courts. The assignment, therefore, in connection with the facts and circumstances shown by the evidence, was presumptively invalid unless shown by the evidence to be valid. No facts were proved sufficient to rebut the presumption."

It clearly appears from the opinion of the court that if the facts warranted it the presumption might have been overcome. The grantee in that case did not attempt to rebut the inference properly drawn from the evidence offered by the executor, explaining his connection with the transaction.

It is considered that the rule established by the very great weight of authority may be stated as follows: The mere existence of a confidential relation between a testator and a beneficiary under his will, such as attorney and client, physician and patient, priest and parishioner, confidential advisor and his advisee, etc., does not of itself constitute undue influence nor cast upon the beneficiary the burden of disproving undue influence. However, the existence of such a relationship may cause a court to scrutinize the evidence more closely and weigh it more carefully. When coupled with other circumstances such as the activity of the beneficiary in procuring the drafting and execution of the will or a sudden and unexplained change in the attitude of the testator or some other somewhat persuasive circumstance, it gives rise to an inference of undue influence which the proponent has the burden of rebutting. In

addition to authorities already cited consult the following: 68 C. J. p. 751, sec. 442. See an extensive note, Presumption and burden of proof as to undue influence on testator, 66 A. L. R. 228, with extensive citation and classification of cases.

This brings us to a consideration of the facts of this case in the light of the principles of law already set out. The ultimate facts necessary to be proven in order to establish undue influence have been frequently stated. We shall state them briefly without comment or citation of authority as it facilitates the discussion of the issues. (1) A person unquestionably subject to undue influence. (2) Opportunity to exercise such influence and effect the wrongful purpose. (3) A disposition to influence unduly for the purpose of procuring improper favor. (4) A result clearly appearing to be the effect of the supposed influence.

As already stated, the court found all of these necessary facts in the order stated. In his opinion he referred to the failure of the testatrix to state certain facts in the letters which she wrote shortly after the execution of the will. This has already been commented upon. He then says:

"This letter, together with the testimony of Myrtle Button, Martha Anderson, Alice Faulks and Emma Olson furnishes convincing proof that on January 14, 1942, when she signed the instrument propounded by L. G. Patterson as her last will, Mary Faulks was mentally impaired."

It is considered that this finding is contrary to the great weight and clear preponderance of the evidence. The letter to which the court referred, in addition to being written after the will was made and therefore may not be evidence of the condition of her mind at the time the will was executed, discloses no mental impairment that we can discover for the reasons already stated. The break with the Jensens no doubt greatly disturbed her peace of mind but it did not impair her

ability to consider, decide, and act. No witness, lay or professional, testified that Mary Faulks was mentally impaired or to facts from which it can be fairly inferred. The fact that her friends and neighbors were bored because she frequently talked about her symptoms, operation, medical care,.and remedies, and unduly praised her physician who had been attentive and helpful, is no proof of mental impairment.

The court also found that Dr. Patterson had an opportunity to exercise undue influence upon testatrix so as to cause her to make a will in his favor. Being her neighbor and physician he was called frequently to her home to attend her as well as to attend her while she was in the hospital, there can be no doubt that such opportunity existed.

The court further found that L. G. Patterson, the proponent, was disposed to influence the deceased unduly for the purpose of procuring improper favors. We are unable to find a single shred of testimony in support of this finding unless it be the remark said by Mary Faulks to have been made by the Doctor to the effect that "They [the Jensens] were afraid you would turn your toes up before they got it" (referring to the $1,000 which Mary gave them for a car).

If this constituted undue influence it is the only testimony we have been able to find in the case which looks that way.

It is argued that there was concealment. We are unable to discover that there was anything about these transactions which was concealed,—on the contrary, they seem to have been known and discussed by the neighborhood at large. While the January, 1941, will was drafted by her regular attorney at her personal request without any suggestion from the Doctor or anyone else, she sent for Mr. McHenry, a well-known attorney, and asked him to bring two witnesses with him for the drafting and execution of the January, 1942, will. There is no evidence that at any time or any place Dr. Patterson suggested the making of the will or suggested its contents or said anything about it or knew anything about it until

after it was made. It does appear that after Mr. McHenry had left the will with Mrs. Faulks, she gave it to Dr. Patterson presumably for filing with the county judge. He testified that he knew nothing of its contents until after it was probated except that when Mrs. Faulks handed him the will, she said, there was something in it for him.

The court found that the execution of the alleged will clearly appeared to be the effect of undue influence exercised over Mary Faulks by L. G. Patterson. This finding can only be based upon the fact that Dr. Patterson is the principal beneficiary of the will. There is no other fact appearing in the evidence to support this proposition. While the county judge found that the will of January, 1942, was procured by undue influence, he did find that the will of January, 1941, was not so procured and was her free will, although it gave something over $11,000 to Dr. Patterson. It is considered that these findings are inconsistent. Being based upon the benefactions of the testatrix, logically the same result should follow, the only difference being in the size of the benefactions.

While the court did not so find, it is contended here that in the evidence it appears that the will is an unnatural will. Inasmuch as this proposition bears upon undue influence by Dr. Patterson, the two may be well considered together. Mrs. Faulks died without any blood relatives except her sister. Eliza Palmer received no legacy under the January, 1942, will. Under the wills of 1941, 1940, and 1936 she was a substantial beneficiary. We have already set out at length the testimony regarding the relations of William Jensen with George and Mary Faulks. He had received a good home, excellent care, had been treated as a son would have been treated, was given a valuable farm, and received many other favors from the Faulks. In return he had discharged the duties and obligations of a good son but he nevertheless was not a son and had no claim upon the estate of Mary Faulks except by virtue of her will. It is true that Mary Faulks was on friendly

terms with Pearl Jensen and their daughter Lorraine and was greatly attached to them and that they were disinherited by the will of January, 1942. Dr. Patterson being the principal beneficiary would have a heavy burden cast upon him to explain this change in the attitude of the testatrix if there were not other and further facts to be taken into consideration. There can be no doubt at all from all of the evidence that some time between January 10 and 12, 1942, a quarrel of considerable proportions developed between Mary Faulks and Pearl and Will Jensen, one undenied and undeniable fact stands out in support of this conclusion, and that is, that after the month of January, they never went near her, never inquired about her, and did not attend her funeral. Death is a great leveler and a great solvent of human relations and however deep their resentment might have been because of the fact that Mrs. Faulks was disposing of her property in a way they did not approve, if there was nothing more between them than her request that they stay away, they would have attended her funeral and made some inquiry in regard to her between January 14, 1942, when she made the will, and December 12, 1942, when she died. The letters that she wrote later indicate some softening of the feelings of the testatrix toward the Jensens. There is nothing that indicates that they relented in any degree even after her death.

The Faulks apparently had discharged every obligation they owed Will Jensen. He is in no position to claim the rights of a natural son. Long, pleasant, and mutually intimate association is no substitute for blood relationship either in law or in fact. Of course there may be exceptional cases but the fact that there are exceptions proves the general rule. Even in the absence of an adequate explanation of her change in attitude toward the Jensens, her will could scarcely be called unnatural. Such a disposition as she made of her property would probably meet with the disapproval of many, if not most, people but she had a perfect right to so dispose of it if she did

so of her own free will. A good deal is made of the fact that Dr. Patterson called upon her frequently, did little favors for her, and it appears without question that she became very greatly attached to him. Such an attachment is nothing unusual in the case of successful practitioners of medicine. Here was an elderly woman with a serious heart ailment living alone, attended by a faithful and competent physician, as she believed an unusually competent one, no doubt because he rendered her competent service. Under the circumstances there is nothing strange about her attachment. The extent of it is perhaps unusual but not infrequent. A doctor might well hesitate before accepting such gratuities from a patient. Such transactions are in the minds of the general public subject to the inference that something wrong has occurred. Offers from clients and patients to make gifts of considerable value are not at all uncommon in the experience of lawyers and doctors. While a sensitive man might not accept such gifts, there is no rule of law which prohibits it. Will and Pearl having interfered in what she thought was her own business, and in effect charged her with inability to manage her own affairs, she being somewhat quick tempered was deeply offended. Just why they should have attempted to assume a partial guardianship over her is hard to say unless they regarded themselves as expectant beneficiaries and thought that their interests might suffer. There being no shred of evidence in this case that Dr. Patterson ever did or said anything but what a physician might properly say and do for his patient without arousing any suspicion, it is considered that the finding of the trial court is contrary to the great weight and clear preponderance of the evidence, and that the contestant failed to establish undue influence by clear, convincing, and satisfactory evidence.

Considerable reliance is placed by the contestants upon the fact that Dr. Patterson took the plaintiff for a ride on three separate occasions in his airplane. A good deal of emphasis

is also placed by the contestants upon the advancements made by the testatrix to Dr. Patterson. These advancements did not in the mind of the trial court constitute a basis for a finding of undue influence on the part of Dr. Patterson inasmuch as he admitted the 1941 will to probate. In addition to the airplane ride, it is pointed out that on three occasions Dr. Patterson sent flowers to the testatrix. There is evidence also that he responded promptly to her calls for medical attention; that the relations between Dr. Patterson's wife and testatrix were friendly and intimate,—nowhere in the evidence is there any suggestion that these courtesies and attentions shown by the proponent to his patient had anything to do with the making of the January, 1942, will. They do not form a basis for an inference that they were done with any intention or expectation of influencing the testatrix with respect to the disposition of her estate. They do not form a basis for even a suspicion and, if they did, undue influence cannot be based upon mere suspicion.

In *Will of Schaefer* (1932), 207 Wis. 404, 411, 241 N. W. 382, which was a contest of a will on the ground of undue influence, this court said:

"Undue influence should not be confused with that highly proper influence which results naturally from kindnesses done, or love and affection bestowed, which rightly and naturally give rise to feelings of esteem and gratitude."

In *Mackall v. Mackall* (1890), 135 U. S. 167, 172, 10 Sup. Ct. 705, 34 L. Ed. 84, the supreme court of the United States said:

"Influence gained by kindness and affection will not be regarded as 'undue,' if no imposition or fraud be practiced, even though it induce the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. . . . It would be a great

reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them."

In *Will of Jackman* (1870), 26 Wis. 104, 116, this court said:

"We must have some distinct and satisfactory proof that she [second wife] exerted over him an influence which the law condemns as unlawful and improper, in order to avoid the will. It is consequently not enough to destroy the will to show that it was very advantageous to Mrs. Jackman, and greatly in her favor."

*Will of Wallace* (1928), 197 Wis. 323, 325, 326, 222 N. W. 255, was a much stronger case for the contestant than this. The trial court found undue influence, this court reversed. In its consideration of the testimony, the court said:

"The most that the record discloses is that there was a relation of trust and confidence and an opportunity to exercise influence. But there is absolutely no proof of any disposition to exercise such undue influence or that such influence was exercised, unless it can be found in the fact that testatrix gave the residue of her property to Mrs. Tezlaff."

The court then quoted with approval the following from *McMaster v. Scriven* (1893), 85 Wis. 162, 171, 55 N. W. 149:

"Undue influence 'cannot be presumed from conjecture or suspicion without reasonable and satisfactory proof of facts establishing the contrivance and undue influence. . . . It must be such an influence as to destroy the freedom of the testator's will, and thus render his act obviously more the offspring of the will of others than of his own. It must be an influence especially directed toward the object of procuring a will in favor of particular parties. . . . It must be such as was intended to mislead him to the extent of making a will essentially contrary to his duty; and it must have proved

successful to some extent, certainly,' and 'must be such as in some degree to destroy the free agency of the testator, and constrain him to do not only what is against his will, but what he is unable to refuse or too weak to resist.' There must be proof that the act was obtained by importunity which could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force and fear."

While this is perhaps a strong statement of the law on the subject we find nothing in the evidence in this case which comes anywhere near bringing it under the rule laid down. The court was therefore in error in denying the will of January 14, 1942, admission to probate.

*By the Court.*—The judgment appealed from is reversed, and the cause is remanded with directions to enter judgment admitting the will, dated January 14, 1942, to probate and for further proceedings according to law.

·FOWLER, J. (*dissenting*). I think that upon the full and very fair statement of the evidence given in the opinion of the court the judgment so far as it denies probate to the will propounded by Dr. Patterson should be affirmed, in view of the familiar fact that undue influence can seldom if ever be proved by direct evidence, and the rule of *Will of Stanley,* 226 Wis. 354, 276 N. W. 353, which is stated in Syllabus 1, as follows:

"The four elements necessary to establish undue influence in the making of a will are a person unquestionably subject to undue influence, another's opportunity to exercise such influence and effect the wrongful purpose, a disposition to influence unduly for the purpose of procuring an improper favor, and a result clearly appearing to be the effect of such supposed influence; and where three of the elements are satisfactorily proven, very little evidence of the fourth is required."

That Mrs. Faulks was subject to undue influence is clear from the readiness with which on four occasions she let Dr.

Patterson have money, aggregating $14,700, without any security except a mortgage of $4,000, which she afterwards satisfied, all without any reason or excuse, but what the trial court was justified by the evidence in inferring to be a silly infatuation for her "dear Doctor." The opportunity of the Doctor to exercise undue influence is plain. The Doctor's disposition to exercise such influence to secure improper favor is manifest from his successive applications for money and his taking Mrs. Faulks to the register of deeds' office for her to satisfy the $4,000 mortgage. The legacy to the Doctor is clearly such as to be effected by undue influence if such influence was in fact exercised. The situation was therefore such that only "very little evidence" was necessary to establish to the satisfaction of the trial judge that the Doctor exercised undue influence, and the circumstances, in my opinion, afford the quantum of evidence essential to justify that conclusion. The Doctor's performance of service outside and beyond the calls of duty might justify the bestowing of a medal, but the bestowal of $14,700, to say nothing of $40,000 or more, can hardly be accounted for except by inference that his such service was rendered with the purpose of securing benefactions as a result of it. The Doctor knew of the woman's wealth, and after getting the first $1,100 from her he knew that she was an "easy mark." The conclusion that he took advantage of the confidential relation that exists between physician and patient to induce the manifold favors can hardly be avoided. The Doctor clearly did not take his patient up in an airplane for her health. That he did this for his own rather than her good, went with her to Yellowstone park, gave her two hundred forty-nine days hospitalization, paid for an eye operation which he himself was unable to perform, and made countless unnecessary calls, all beyond the requirements of professional duty and his contract to render her professional service during her life, and poisoned her mind against Mr. Jensen, all as

means of influencing benefactions to himself, was not an unreasonable inference for the trial judge to draw.

The same considerations that lead me to approve the trial judge's rejection of the 1942 will of Mrs. Faulks leads me to think that the probate of the 1941 will should have been denied also. By that will the "dear Doctor" was to receive a gift of $13,600 besides the benefit that accrued to him by the agreement that for the first $1,100 received he was to render professional service for Mrs. Faulks during her life. The circumstances are quite as potent to lead to the inference that that will was induced by undue influence as that the 1942 will was. This would lead to the probate of the 1940 will. As the Doctor would receive nothing by that will it cannot be held to have been induced by the exercise of undue influence by him.

I think also that the 1942 will was an unnatural one for Mrs. Faulks to make and that this is of some significance. The quarrel with the Jensens that the court considers explains cutting them off from the provisions theretofore made for them in the joint will and the wills of 1936, 1940, and 1941 previously made does not apply to their daughter Lorraine. There was no quarrel with or misconduct by her who by all said previous wills had been given $10,000. Cutting off Lorraine in favor of one for whom only a foolish infatuation existed, was unnatural and indicates some mental abnormality or impairment. So of not making provision theretofore made in all the wills mentioned for Mrs. Alice Faulks, her deceased husband's indigent sister. It would also seem that something must have been done by the Doctor between the making of wills of Mrs. Faulks in 1940 wherein the Doctor was given nothing and the will of 1941, wherein he was forgiven debts of $13,600. The conclusions of fact drawn by the trial judge from the circumstances of this case are not, in my opinion, brushed aside by the discussion in the opinion of the court of the rule as to burden of proof, which is logically

correct, or by the suggestion that kindness is not undue influence. The crucial question of the case is—Do all the circumstances justify the conclusion clearly reached by the county judge that Dr. Patterson used the influence incident to the confidential relation existing between physician and patient to induce the benefaction granted to him by the 1942 will? The relation between the Doctor and his patient was manifestly very close. The influence attributable to the confidential nature of that relation that the Doctor might exert upon his patient in view of her age and physical condition is very great. But for that confidential relation the view of this court would be correct, but that relation existing, I think that the conclusion of the county court that undue influence was exerted by Dr. Patterson is justified.

I am impelled to say further that the testimony indicates that the husband of Mrs. Faulks died in 1934 leaving a will by which he left to his wife the use of his property during life and several legacies to others. I am unable to understand why that will was not offered for probate in view of what has been said by this court in *Will of Dardis,* 135 Wis. 457, 115 N. W. 332; *Will of Rice,* 150 Wis. 401, 406 *et seq.,* 136 N. W. 956, 137 N. W. 778; and *Graef v. Kanouse,* 205 Wis. 597, 238 N. W. 377. In these cases the wills were admitted to probate and attempt was made to evade their provisions by agreements between the beneficiaries, while in the instant situation the attempt was apparently made by the wife to evade her husband's will by not offering it for probate and as a result acquiring the whole of the husband's estate by descent instead of a life estate therein under the will or the part given her by election under secs. 233.12 and 233.14, Stats. A will of a testator should no more be frustrated by not offering it for probate than by probating it and then agreeing upon a distribution different from that provided in the will. Sec. 310.02 makes the delivery of a will to the county court mandatory upon those having its custody and knowledge of the testator's

death, and upon an executor having knowledge of his appointment and of such death. Sec. 346.58 makes it a criminal offense to suppress a will with intent to defraud. It would appear from the testimony herein that these statutes were violated. It was the duty of the trial courts in the cases above cited to refuse to countenance the attempts of the interested parties to circumvent the wills, although no party at the time objected to it. Was it not the duty of the trial court in the instant case, although no one at the time objected to it, to see that the will of the husband, if there was such, was not suppressed? Should not the county judge under the provisions of secs. 310.02, above cited, and 310.10, relating to probate of destroyed will, when it appeared from the testimony that the husband left a will and that Will Jensen was the executor named in it, have required Jensen to offer it for probate as a destroyed will, if proof of it as such could be produced? I think this should have been done. If this were done, the effect of the proceeding would apparently greatly affect the distributions under the wills of 1940, 1941, or 1942 if either were admitted to probate. The property of George Faulks should be distributed according to his will, if he left one. I perceive no reason why the husband's will, if he left one duly executed, cannot now be probated, if its terms may be established. Of course it may be that under the facts and the law—neither of which is now before us and neither of which we can now decide or intimate opinion concerning—the will of the husband for some reason not now apparent, cannot be probated. But as the executor named in that will was before the court, it appears to me that the court might properly have required him to make full disclosure of provable facts to the end of protecting the public interest in having the inherent right of a person to dispose of his property by will protected.

In my view, the judgment of the county court, so far as it denied probate of the will of 1942, should be affirmed; the

portion admitting to probate the will of 1941 should be reversed; the will of 1940 should be admitted to probate if proof of its due execution and contents was made, and if not the trial court should be directed to receive proof as to those facts and decide as to its probate according to the facts found; so as to the will of 1936 if the will of 1940 is not proved; and the respondent, Will Jensen, as executor of a will apparently executed by George Faulks, should be directed to propound such will for probate, unless on investigation by him it appears to the court that evidence to establish it as a last will cannot be produced.

I am authorized to state that Mr. Justice BARLOW concurs in this dissent.

FAIRCHILD, J. (*dissenting*). I am largely in accord with the dissenting opinion of Mr. Justice FOWLER. In this case it is apparent that appellant was in a favorable position for influencing the testatrix. It certainly appears that he exercised persuasion in his own interests. It, also, is evident that Jensen and others were not excluded from her consideration as objects of her bounty until after appellant's suggestion to her that Jensen was not cordial in his relations to him. Was that an innocent observation? Were other acts referred to in the opinions already filed unselfish, not colorable and prompted by design? In considering this case, the trial court had in mind that testatrix was in appellant's hospital at the time of the drafting of the will, that a nurse in his employ was the one who brought the scrivener to her bedside, and that appellant and one of his employees participated in the destruction of a former will. I think the progressive growth of his influence, and the use made of it by appellant, sufficiently indicates a descent to the grade of undue influence so that the trial court was warranted in reaching the conclusion it did.